IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CONTINENTAL CARBON COMPANY, INC., a )
Delaware Corporation )
)
    Plaintiff, )
)
v. )
)
     )
     )
NATIONAL UNION FIRE INSURANCE )
COMPANY of Pittsburgh, PA, a Pennsylvania )
Corporation, )
)
    Defendant. )
)
)

Civil Action No.

cv 3:07CV872 - MEF

JURY TRIAL DEMANDED

---

**PLAINTIFF CONTINENTAL CARBON COMPANY'S COMPLAINT FOR (1)
DECLARATORY RELIEF REGARDING THE DUTY TO DEFEND AND THE DUTY
TO SETTLE; (2) BREACH OF CONTRACT FOR WRONGFUL DENIAL OF THE
DUTY TO DEFEND AND WRONGFUL DENIAL OF THE DUTY TO SETTLE; AND (3)
BAD FAITH BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING**

---

## I.    INTRODUCTORY STATEMENT

    1.    This insurance coverage case concerns defendant National Union Fire
Insurance Company of Pittsburgh, PA's ("National Union's") total failure to honor its broad
coverage commitment to its insureds, plaintiff Continental Carbon Company, Inc..

    2.    First, National Union failed to defend Continental Carbon against claims
brought regarding its Phenix City, Alabama facility concerning carbon black contamination
allegedly escaping from the Phenix City plant. Carbon black is Continental Carbon's chief
product.

    3.    Second, National Union failed to settle the underlying matter when an
opportunity to settle well within policy limits arose. National Union would not even negotiate

DOCSLA-24298v01

with the underlying matter's plaintiffs whose counsel indicated his clients would settle for less than the amount formally demanded. Instead, at each critical juncture, National Union abandoned Continental Carbon offering no assistance at all.

4.     When the underlying lawsuit did not settle, it was tried to a jury in this Court. The jury not only found Continental Carbon liable, but imposed compensatory and punitive damages many times greater than plaintiffs' prior settlement offer, and even more than they had indicated they would have settled had National Union only started negotiations in good faith.

5.     Continental Carbon's efforts to overturn the adverse verdict to date have been unsuccessful, with the trial verdict affirmed on March 21, 2007, by the Eleventh Circuit Federal Court of Appeals. Neither the trial nor appeal regarding the underlying action's verdict would have been necessary, had National Union performed its defense and settlement duties in good faith.

6.     Were that not enough, the adverse trial outcome imposing a multi-million dollar verdict upon Continental Carbon as a target for other plaintiffs. Plaintiffs' counsel quickly expanded another lawsuit regarding the same site on behalf a far greater number of plaintiffs. Still another claim regarding the Phenix City facility was recently made against Continental Carbon. Additional claims were made against Continental Carbon regarding its facility in Oklahoma, mimicking the first lawsuit's allegations, even involving some of the same plaintiffs' counsel.

7.     In short, National Union's failure to honor it defense and settlement duties to Continental Carbon allowed a manageable liability situation to metastasize. Indeed, the full ramifications of National Union's abandonment of Continental Carbon cannot even now be fully ascertained as the damages to Continental Carbon continue to mount.

8.     Continental Carbon brings this action to recover from National Union the insurance benefits due under the policy for defense of the initial underlying action, the judgment rendered in the initial underlying action, and the cost to defend and, in certain cases, settle, the additional actions spawned by the adverse verdict in the initial underlying action. All of these

2

damages were suffered by Continental Carbon as a direct proximate result of National Union's breach of its duties to Continental Carbon.

## II.     THE PARTIES

9.     Plaintiff Continental Carbon Company, Inc. is a Delaware Corporation, with its principal place of business in Houston, Texas. Continental Carbon manufactures and sells the product known as carbon black at its Phenix City, Alabama, facility, and it is registered and authorized to do business in the State of Alabama.

10.     Defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania is a Pennsylvania Corporation, with its principal place of business in New York, New York. National Union does business throughout all of Alabama, including in this Court's district.

## III.     JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this action based upon diversity of citizenship pursuant to 28 U.S.C. Section 1332. Complete diversity of citizenship exists at this time of filing of this action. The amount in controversy exceeds the sum of $75,000.

12.     Continental Carbon's Phenix City facility, the alleged cause of injury to the plaintiffs in the underlying matter, is located within this Court's district. National Union does business within Alabama, including this Court's district. The location in which National Union should have provided the defense to Continental Carbon, and the underlying action that should have been settled took place in this Court, and therefore this district. Indeed, the first location in which the failure to defend Continental Carbon and settle the initial matter caused collateral damage to Continental Carbon by way of a similar action was the dramatic expansion of a state tort action in this district from one to 140 plaintiffs following the large adverse jury verdict in the initial underlying action.

## IV.     FACTUAL BACKGROUND

### A.     The Underlying Action

3

13.    Continental Carbon owns and operates a manufacturing plant in Phenix City, Alabama, that produces carbon black.  Carbon black is a highly engineered product manufactured by heating feedstock oil to a high temperature in a low-oxygen reactor. The resulting product is smoke that includes both carbon black and waste gases. The carbon black is separated from the gases, processed, and formed into small pellets for ease of handling and shipment.  Continental Carbon sells carbon black for use in making tires, rubber and plastic items, inks, and other products.

14.    The separation process occurs in stages using filters located in what is known in the industry as bagfilter compartments.  Pressurized smoke carries carbon black through the compartments, where the bagfilters capture the carbon black.  In a closed system such as exists in the Phenix City plant, if everything is working well, no carbon black should escape, and the remaining gasses are expelled through exhaust towers.

15.    On or about August 12, 2001, some property owners located across the Chattahoochee River and within approximately one and one-half miles from Continental Carbon's Phenix City plant filed a lawsuit in this Court entitled *Action Marine, Inc. et al. v. Continental Carbon*, et al., Case No. CV 01-D-994-E (the "underlying action").  (A copy of the underlying action is attached hereto as Exhibit A.)  The underlying action's complaint was amended twice to add certain causes of action and additional plaintiffs, including the City of Columbus, Georgia.  Plaintiffs' effort to certify the class action was denied with the action proceeding on behalf of the named plaintiffs.

16.    As set forth more fully in Exhibit A , the underlying action plaintiffs, all of whom were located in Georgia, alleged that the Phenix City plant repeatedly emitted carbon black either continuously or intermittently over a number of years into the air, which then attached to plaintiffs' real and personal property. Carbon black is known to be oily, adhesive, and penetrating, when it allegedly attached onto the plaintiffs' properties, it allegedly darkens that property.

4

17.    The underlying complaint also contained allegations concerning the alleged adverse health effects of carbon black.  The property owners sought damages for cleanup and monitoring costs for alleged injury to their property from carbon black.  Carbon black emissions and damages allegedly occurred during the National Union policy period.

18.    In their first count for negligence, the underlying action plaintiffs alleged that Continental Carbon was "guilty of negligence because during the manufacturing process, or through the process in which [Continental Carbon] supervise[s] and control manufacturing, the [it] negligently discharged Carbon Black dust into the environment surrounding the Continental plant in Phenix City, Alabama.  As a result of this wrongful conduct, [Continental Carbon] breached [its]  standard of due care to the plaintiffs and as a direct and proximate result of [its] negligence, the plaintiffs have been injured and damaged."  (Exhibit A, Paragraph 33)

19.    Plaintiffs further asserted claims for Wanton Conduct, Breach of the Duty to Warn, Fraud, Nuisance, Trespass, Common Law Strict Liability, and Permanent Injunction.

20.    Through discovery and motion practice, the underlying plaintiffs again and again pointed to releases of carbon black from Continental Carbon's Phenix plant during the manufacturing and collection process of carbon black, the plant's chief product.  In short, the plaintiffs contended that it was Continental Carbon's product, carbon black, that had escaped during the collection process and contaminated their property.

### B.    National Union's Umbrella Coverage

21.    National Union issued Policy No. BE 7408845 to Continental Carbon covering the policy period July 30, 2001 to July 30, 2002 (the "Policy").  (A copy of the Policy is attached hereto as Exhibit B and incorporated herein by this reference.)

22.    The Policy is a Commercial Umbrella Policy, providing per occurrence coverage of $25,000,000.  The Policy establishes a general aggregate limit of $25,000,000, and a specific liability limit for Products-Completed Operations of $25,000,000.

5

23. Consistent with the basic purpose of umbrella policies, the Policy provides broad coverage designed to provide generous excess limits above the underlying primary Commercial General Liability insurance upon exhaustion of the primary policy's applicable coverage, or primary coverage in its own right when its broader terms apply and the underlying insurance's coverage does not.

24. National Union had been the umbrella insurer for Continental Carbon for a number of years prior to the Policy, with the prior policies containing similar terms as far back as 1997. National Union had received substantial premiums from Continental Carbon to provide the broad protection of umbrella coverage but until the underlying action had not been called upon to apply that coverage. Unfortunately, when it was called upon to respond to the underlying action, National Union failed abysmally to hold up its end of the bargain, failing to honor its broad promises to Continental Carbon.

25. More specifically, as stated on the Policy's schedule of underlying insurance, the Policy is excess to the General Liability Policy issued by American International Specialty Insurance Company ("AISLIC") Policy No. EA 6190493.

26. It is helpful to appreciate some of the underlying policy's terms. The AISLIC policy provides general coverage with a general aggregate limit of $2,000,000, and a products-completed operations limit of $2,000,000. The AISLIC policy specifically provides pollution legal liability in the amount of $1,000,000 per loss. The AISLIC's policy's pollution legal liability coverage is provided on a claims made basis for claims made during the policy's July 30, 2001 to July 30, 2002 policy period. The underlying AISLIC policy commits the insurer to defend Continental Carbon for potentially covered claims, but also provides that defense expenses paid by AISLIC deplete the available limit of coverage. The underlying insurer's defense duty ceases when the policy's $1,000,000 pollution limit of coverage is exhausted.

27. The Policy's own grant of coverage provides that National Union "will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law . . . because of Bodily Injury, Property

6

Damage, Personal Injury or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world."

28.     National Union further agreed in the Policy that it would have both "the right and the duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when . . . . the applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the Insured have been exhausted by payment of claims to which this policy applies."

29.     "Bodily Injury" is defined by the Policy to mean "bodily injury, sickness, disability, disease. Bodily Injury shall also mean mental injury, mental anguish, humiliation, shock or death if directly resulting from bodily injury, sickness, disability, or disease."

30.     "Property Damage" is defined by the Policy to mean "Physical injury to tangible property, including all resulting loss of use of that property, [or loss] of use of tangible property that is not physically injured."

31.     "Occurrence" is defined by the Policy to mean "an accident, including continuous or repeated exposure to conditions which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured."

32.     "Product-Completed Operations Hazard" is defined by the Policy to include "all Bodily Injury or Property Damage occurring away from your premises you own or rent and arising out of Your Product or Your Work, except . . . products that are still in your physical possession; or . . . work that has not been complete or abandoned."

33.     "Your Product" is defined to mean "any goods or products, other than real property, manufactured, sold, handled, distributed or disposed by you[.]"

34.     Exclusion M of the Policy excludes coverage generally for pollution. However, the Policy specifically excepts application of the pollution exclusion to coverage for the Products-Completed Operations Hazard, "as long as insurance for such Bodily Injury, Property Damage or Personal Injury is provided by the policy listed in the Schedule of

7

Underlying Insurance." (As is noted above, the underlying AISLIC policy specifically provides products-completed operations coverage, specifically providing coverage for pollution through the pollution legal liability coverage.)

35.     Endorsement 12 of the Policy then deletes Exclusion M (the pollution exclusion). In Exclusion 12, coverage for pollution is again generally excluded, but the exclusion expressly does not apply to the Policy's Products-Completed Operations Hazards coverage. Other exceptions are also spelled out, but the reiteration of the exception for Products-Completed Operations coverage is the main focus here given that the underlying action focused upon alleged contamination resulting from carbon black, Continental Carbon's main product.

36.     Endorsement 12 sets forth an arbitration provision limited to "interpretation of this endorsement." The arbitration requirement does not extend to National Union's performance of its duties under the Policy.

37.     The Policy does not contain an exclusion of coverage for punitive damages that may be awarded against the insured. Unless some other exclusion applies, punitive damages are indemnifiable under the Policy's terms.

### C.     National Union's Wrongful Denial Of Its Duty To Defend And Its Failure To Settle

38.     When the underlying action first arose, Continental Carbon provided notice of that claim to AISLIC, which like National Union, is a member of the AIG Group of Insurance Companies. AIG Technical Services, Inc. (then the AIG claims handling arm responsible for claims handing for AISLIC and National Union), agreed on behalf of AISLIC to pay for Continental Carbon's defense up to the applicable limits of coverage of the AISLIC policy. Accordingly, AISLIC funded the underlying action's defense for nearly two years until payments toward the defense equaled the AISLIC policy's loss limit for the Pollution Legal Liability coverage. Upon payment of the full $1,000,000 in pollution legal liability coverage, AISLIC withdrew from the defense advising Continental Carbon to look to its umbrella insurer to pick up the defense. The umbrella insurer in this case was National Union, AISLIC's sister AIG insurer.

8

39.     Prior to the withdrawal of AISLIC from the defense, Continental Carbon advised National Union that it should be prepared to assume responsibility for the defense of the underlying action pursuant to the terms of the underlying policy given the exhaustion of the underlying coverage.

40.     In a letter dated September 29, 2003, and received by Continental Carbon October 3, 2003, AIG Technical Services informed Continental Carbon that National Union declined to defend Continental Carbon. National Union mistakenly claimed that coverage was precluded by the Policy's pollution exclusion. National Union referred to Endorsement 12 of the Policy and mistakenly claimed that the pollution exclusion therein barred coverage. (A copy of National Union's denial of coverage is attached hereto as Exhibit C.)

41.     National Union's denial failed to consider the exception to the pollution exclusion provided for coverage arising out of the Products-Competed Operations Hazard. National Union failed to consider that the underlying plaintiffs' allegations concerned carbon black, which is the Phenix City plant's chief product. The plaintiffs' carbon black contamination allegations clearly arose out of "products . . . manufactured, sold, handled, distributed or disposed by [Continental Carbon]," and therefore fell within the product coverage of the Policy.

42.     Correspondence from Continental Carbon pointing out the deficiency of National Union's coverage analysis failed to cause National Union to reconsider its denial of coverage even though National Union could not dispute that Continental Carbon's product lay at the heart of the underlying plaintiffs' injury claims.

43.     National Union's denial of coverage forced Continental Carbon to defend the underlying action on its own having been wrongfully abandoned by National Union. Using its own resources, Continental Carbon incurred millions of dollars of defense fees and costs that should have been incurred and paid by National Union. Those defense payments have continued into even this year as Continental Carbon challenged the adverse trial outcome and judgment. National Union's defense duty is a continuing one until the underlying defense is completed in full.

9

44.    Although National Union denied coverage, Continental Carbon continued to try to enlist National Union's assistance in hopes that it would honor its coverage obligations to Continental Carbon. Indeed, when the plaintiffs' counsel made a demand to settle the case for several million dollars, stating to Continental Carbon's counsel that the matter could ultimately be settled for less, Continental Carbon asked National Union settle the matter or at least negotiate with the plaintiffs in order to reach the most favorable settlement. Continental Carbon specifically advised National Union that settlement could be effected for less than plaintiffs' formal demand even though that offer itself was reasonable given the risk that the litigation posed for Continental Carbon. Continental Carbon pleaded with National Union to step forward to settle the matter, or at least to negotiate with the plaintiffs. National Union refused and continued to remain on the sidelines.

45.    Right up until trial began in the underlying matter on August 11, 2004, Continental Carbon pleaded with National Union to try to settle the underlying matter. Continental Carbon again advised National Union of the risk to which trial exposed Continental Carbon including claims of punitive damages. National Union again refused to step forward to aid Continental Carbon.

**D.    The Adverse Jury Verdict And Award In The Underlying Action And How They Acted As A Catalyst For Other Actions**

46.    On or about August 25, 2004, after a 10-day trial, the jury returned a verdict in favor of the property owners on all claims and determined that Continental Carbon's actions warranted punitive damages. The jury awarded compensatory damages in the amount of $1,915,000. The jury also awarded $1,294,000 in attorney fees and assessed punitive damages at $17,000,000.

47.    All subsequent efforts to overturn the award by Continental Carbon through post-trial motions, and an appeal to the Eleventh Circuit Court of Appeals, proved to be unsuccessful. Continental Carbon's appeal was denied on March 21, 2007, and rehearing denied on May 18, 2007.

DOCSLA-24298v01

48.     Unfortunately, the adverse consequences of the jury award in the underlying action was not limited to the jury's verdict and award. The size of the award prompted other actions to be brought against Continental Carbon (often by the same plaintiffs' attorneys) or substantial expansion of other actions. A state action filed by a single plaintiff in Alabama state court for Russell County, entitled *Riley v. Continental Carbon, et al.*, Case No. CV-04-182, in or about April 2004, expanded in November 2004 after the underlying action jury verdict to name more than 140 plaintiffs.

49.     More recently, an additional claim has been made in Alabama upon Continental Carbon on behalf of still more potential plaintiffs regarding purported carbon black injury from the Phenix City plant. At least three additional lawsuits were brought against Continental Carbon in the state and federal courts of Oklahoma regarding Continental Carbon's carbon black Ponca City, Oklahoma plant. These complaints mimic the carbon black contamination allegations made in the underlying action. Indeed, many of the same plaintiffs' counsel were involved.

50.     National Union refused to aid Continental Carbon regarding any of these actions except in one cynical respect described below. Confronted with the adverse underlying action jury verdict, and adverse publicity in the local area about the underlying action, Continental Carbon deemed it prudent to settle the *Riley* matter. At the settlement conference attended by National Union, National Union reiterated its denial of coverage for the underlying action, as well as its denial regarding the *Riley* action. It refused to offer any significant substantive help to Continental Carbon. Instead, National Union sought to use the exigencies of the situation to insulate itself from the consequences of its own misconduct for failing to defend and later to settle the underlying action. National Union offered only a few thousand dollars toward a settlement that would need to be in the millions of dollars. In return for this paltry sum, National Union demanded a full release of all claims against it.

51.     National Union's paltry offer was refused by Continental Carbon. National Union departed from the settlement meeting and was not part of the ultimate settlement that

11

required Continental Carbon to pay a substantial sum to settle the *Riley* action. One of the
Oklahoma actions has also been settled, again with a substantial payment by Continental Carbon.

52.    Had National Union settled the underlying action, these additional actions
would not have arisen or presented a serious threat, and there would have been no need for
Continental Carbon to pay substantial sums in settlement.

## COUNT I: DECLARATORY JUDGMENT
### (Against National Union)

53.    Continental Carbon adopts and realleges the averments in Paragraphs 1-52.

54.    An actual controversy exists between Continental Carbon and National Union.
Continental Carbon contends that a potential for coverage existed regarding the underlying
action necessitating that National Union both defend and make reasonable settlement efforts to
resolve the underlying action.

55.    Contrary to its duty to provide for Continental Carbon's defense and
obligation to make good-faith settlement efforts, National Union contends that it owes no duty to
Continental Carbon to defend either the underlying action or any of the similar actions brought
against Continental Carbon.

56.    Therefore, Continental Carbon is informed and believes, and on that basis
alleges that defendant disputes its duty to defend its insured and its good faith settlement duty.
As a result, an actual controversy exists between the parties with regard to National Union's
duties under the Policy regarding the underlying action and other similar actions.

57.    Continental Carbon has sought interpretation of Endorsement 12 of the Policy
via arbitration with National Union, and the arbitrators for that process have been selected.
However, the arbitration requirement of the Endorsement is strictly limited to interpretation of
the Endorsement's terms and not their application or evaluation of National Union's performance
under the Endorsement or the balance of the Policy's terms, such as its duty to defend or settle.
Concurrent with initiation of this action, Continental Carbon will press forward with the
arbitration to obtain the necessary interpretation ruling to be utilized in this action.

DOCSLA-24298v01

58.    WHEREFORE, Continental Carbon desires a judicial determination and declaration of its rights and defendant's obligations and duties under the Policy. Specifically, Continental Carbon desires a declaration of its right to a defense provided by National Union, of the carbon black contamination cases, and its right to National Union's good-faith settlement efforts.

## COUNT II:  BREACH OF CONTRACT
### (Against National Union)

59.    Continental Carbon realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 58 above.

60.    As stated above, when National Union sold the Policy Continental Carbon, it agreed to, and represented that it would, defend Continental Carbon against any suit seeking damages when there existed the potential of coverage either because the claim was uncovered by the underlying policy or the underlying policy had become exhausted.  National Union also assumed the duty to settle potentially covered matters when reasonable.

61.    For its part, Continental Carbon has performed all obligations imposed on it by the Policy except those obligations it was prevented or excused from performing.

62.    By failing to assume Continental Carbon's defense, and by denying coverage, National Union breached its duty to defend Continental Carbon.  This breach was contrary to Alabama law specifying the liberality with which an insurer must evaluate its duty to defend and the insurance industry custom and practice that adopted and reflects that law.

63.    By failing to honor its settlement duty to Continental Carbon regarding the underlying action, National Union breached its settlement duty to Continental Carbon.  This breach was contrary to Alabama law specifying the liberality with which an insurer must evaluate its settlement duty and the insurance industry custom and practice that adopted and reflects that law.

64.    As a result of defendant's failure to honor its duty to defend and failure to settle the underlying action, Continental Carbon has been forced to bear the burden of its own

13

defense of the underlying action, and related actions that arose or expanded dramatically following the adverse outcome of the underlying action. Continental Carbon has expended millions of dollars of its own funds to both defend itself and to pay for settlement of several matters, all of which would have been unnecessary had National Union honored its duties to Continental Carbon regarding the underlying action. With each passing month, additional fees and costs are incurred by Continental Carbon in its own defense, fees and costs that should be paid by National Union as a direct consequence of its breaches and its original policy terms. Continental Carbon also suffered an adverse jury verdict imposing both compensatory and punitive damages upon it that was a direct result of National Union's failure to settle the underlying action.

65.    As a result, Continental Carbon has been injured and suffered damages as follows

(a)    Continental Carbon has incurred in the past and will incur in the future costs of defense of the underlying and related actions, including but not limited to expenses, attorneys fees and interest on said sums, and

(b)    Continental Carbon has lost the benefit of its bargain for settlement and indemnity payments related to the underlying action, and other actions that arose only as direct result of National Union's breaches.

66.    WHEREFORE, Continental Carbon prays for a judgment for said damages to be determined by a jury in a sum exceeding the minimum jurisdictional requirements of this Court plus interest and costs.

### COUNT III:  BAD FAITH
### (Against National Union)

67.    Continental Carbon realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 66 above

68.    Implied in every insurance policy is a covenant that the insurer will act in good faith and deal fairly with the insured, such that the insurer is obligated to do nothing to

14

DOCSLA-24298v01

interfere with the insured's right to receive the benefits of the policy. An insurer is to give at least the same level of consideration to the insured's interest as it gives to its own. Furthermore, the implied covenant of good faith and fair dealing obligates an insurer to thoroughly investigate the claim and to fully inquire into possible bases that might support coverage and, therefore, a duty to defend. An insurer is further obligated to resolve all doubts concerning the duty to defend in favor of the insured and provision of a defense to the insured. An insurer is also supposed to conduct reasonable settlement efforts, responding to overtures by the claimant, as well as initiating settlement negotiations when appropriate. When considering settlement of a claim for which there exists any potential of coverage, an insurer is to settle the matter without consideration of the coverage issues but to protect the insured against greater liability.

69.    In breach of the implied covenant of good faith and fair dealing, National Union consciously failed to conduct the required investigation and failed to resolve all doubts as to the coverage in favor of its insured. It failed to conduct any settlement negotiations, let alone resolve the underlying matter via settlement. Instead, National Union refused to offer any help toward settlement. National Union denied coverage even though that denial contradicts positions it has maintained in other insurance matters, particularly insurance coverage actions in which National Union pursued recovery for its own benefit. National Union's denial is also contrary to positions taken by the insurance industry generally about the meaning of the policy language at issue.

70. .   National Union's delays and erroneous conclusions regarding coverage, defense, and settlement were inconsistent with Continental Carbon's reasonable expectations of coverage and its expectation that National Union would honor its duty to investigate, defend, and settle.

71.    As direct result of National Union's bad faith breach of its duties to Continental Carbon, Continental Carbon suffered additional defense costs of the underlying action, suffered an adverse verdict imposing both punitive and compensatory damages that would have been avoided had National Union performed as required, suffered similar lawsuits

15

that imposed additional defense and settlement burdens upon it, and suffered injury to its own ability to conduct its business as result of the burden placed upon it by the adverse verdict and additional defense and settlement burdens.

72.    In addition to the damage it suffered for having to bear the burden of the underlying action verdict, and additional defense and settlement costs, Continental Carbon was forced to bear the burden of proving through litigation its rights against National Union.

73.    National Union's conduct has been done with reckless or conscious disregard of Continental Carbon's rights, constituting oppression, fraud, and/or malice, in that National Union engaged in a series of acts designed to deny the benefits due under National Union's insurance. National Union, by acting as alleged above, in spite of all of the information, facts, and relevant law to the contrary, recklessly or consciously disregarded Continental Carbon's rights and forced Continental Carbon to endure substantial and oppressive financial losses without any assistance from National Union, thereby inflicting substantial financial damage on Continental Carbon. National Union ignored Continental Carbon's interests and concerns, with the requisite intent to injure warranting imposition of punitive damages.

74.    As a result of National Union's bad faith, Continental Carbon has been injured and damaged as follows:

(a)    Continental Carbon has incurred in the past and will incur in the future costs of defense, including but not limited to all expenses, attorneys fees and interest on said sums;

(b)    Continental Carbon has lost the bargained-for settlement and liability protection including but not limited to the costs of any settlement or judgment paid by Continental Carbon;

(c)    Continental Carbon's business has suffered as a direct result of the burden imposed upon it to defend, settle and pay judgments all of which should have been dealt with by National Union, or prevented by National Union had it only settled the underlying action as required when the opportunity clearly presented itself; and

16

(d)    Continental Carbon further makes a claim for punitive damages to punish National Union for the enormity of its wrongs, including its reckless, wanton, and intentional acts, and deter other similarly situated insurers from this conduct.

75.    WHEREFORE, Continental Carbon prays for a judgment for compensatory and punitive damages in an amount to be determined by a jury in a sum exceeding the minimum jurisdictional requirements of this Court plus interest and costs.

## CONTINENTAL CARBON DEMANDS TRIAL BY JURY

Respectfully submitted,

Clifford C. Brady (BRADC5423)
Douglas L. Brown (BROWD9054)
Attorneys for Plaintiff Continental Carbon Corp.

OF COUNSEL:

**BRADY RADCLIFF & BROWN, LLP**
1600 Wachovia Bank Building,
61 Saint Joseph Street
Mobile, Alabama  36602
251.405.0045
251.405.0076 (FAX)

DEFENDANT TO BE SERVED BY CERTIFIED MAIL AS FOLLOWS:

NATIONAL UNION FIRE INSURANCE COMPANY OF PENNSYLVANIA
c/o CSC Lawyers Incorporating Service, Inc.
150 South Perry Street
Montgomery, AL  36104

DOCSLA-24298v01

F I L E D

AUG 13 2001

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

2001 AUG 13  P 5: 26

|  |  |
|---|---|
| ACTION MARINE, INC., and JOHN THARPE, individually and on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CONTINENTAL CARBON INCORPORATED; BARRY NIX, individually and as Plant Manager of Continental Carbon Incorporated's Phenix City plant; TODD MILLER, individually, and as Plant Director of Safety, Health and Environmental Affairs of Continental Carbon Incorporated's Phenix City plant; CHINA SYNTHETIC RUBBER CORPORATION; and TAIWAN CEMENT CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

CIVIL ACTION NO.

CV· 01- D-994-E

JURY DEMAND REQUESTED

---

## COMPLAINT

---

### PARTIES AND JURISDICTION

1. Plaintiffs, Action Marine, Inc., and John Tharpe, are residents of the State of Georgia.

2. The plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all members of the class of property owners whose properties are located in the immediate vicinity of Continental Carbon Incorporated's Phenix City, Alabama plant. Plaintiffs, Action Marine, Inc., and John Tharpe, also bring this action on behalf of those who reside within the immediate vicinity of the Continental Carbon Phenix City plant to have been exposed to pollution in the form of Carbon Black dust particles. The plaintiffs aver that joinder of all members of the Class is impractical; there are common questions of law or fact, to the claims of the class,

EXHIBIT A

...ing all factual allegations contained in paragraphs 13 through 31 of this Complaint and the questions of law contained in paragraphs 32 through 47 of this Complaint; the claims of the plaintiffs are typical of the claims of the class; and the plaintiffs in their representative capacity will fairly and adequately protect the interests of the Class.

3. The prosecution of separate actions by individual members of the Class would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the defendants, and/or (b) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. The averments of this Complaint in the following paragraphs will more particularly describe the aforementioned risk of disposition, impairment, or impediment of the interests of the individual members of the Class.

4. The defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate the issuance of final injunctive relief with respect to the Class as a whole. The averments of the Complaint in the following paragraphs will more particularly describe the aforementioned propriety of final injunctive and correspondent declaratory relief and the action of the defendants.

5. The questions of law and fact common to members of the Class predominate over any questions affecting only individual members, so that a class action is a superior method to any other available method for the fair and efficient adjudication of this controversy.

6. Defendant, Continental Carbon Incorporated ("Continental"), is an Corporation organized and existing under the laws of the State of Delaware. Continental's principal place of business is

2

Houston, Texas. Continental manufactures and sells industrial chemicals and compounds and is registered and authorized to do business in the State of Alabama.

7. Defendant, China Synthetic Rubber Corporation, USA ("CSRC"), is a foreign corporation doing business in Alabama as the parent company of Continental.

8. Defendant, Taiwan Cement Corporation, ("Taiwan Cement"), is a foreign corporation doing business in Alabama as the parent company of Continental.

9. Mr. Barry Nix is an adult resident of the State of Alabama, and at all times relevant hereto served as the Manager of the Continental Carbon Phenix City plant.

10. Mr. Todd Miller is an adult resident of the State of Alabama, and at all times relevant hereto served as the Plant Director of Safety, Health and Environmental Affairs of Continental Carbon's Phenix City plant.

11. Mr. Barry Nix and Mr. Todd Miller are members of management at the Phenix City plant where Carbon Black dust is emitted into the surrounding environment. These individual defendants are responsible for the release of Carbon Black particulate from the Continental Phenix City plant in violation of federal standards. Mr. Nix and Mr. Miller have failed and refused to take reasonable actions and precautions to avoid the release of Carbon Black particulate into the air and water adjacent to the Phenix City plant.

12. This Court has original jurisdiction over this action based upon diversity of citizenship pursuant to 28 USC §1332. Complete diversity of citizenship exists at the time of filing of this action. The amount in controversy exceeds the sum of SEVENTY-FIVE THOUSAND and NO/100 DOLLARS ($75,000.00).

3

## FACTUAL ALLEGATIONS

13.   Continental Carbon manufactures a product known as "Carbon Black" at its plant in Phenix City.  Continental Carbon doubled the capacity of its Phenix City, Alabama plant in 1998, bringing the production of the plant to 200 million pounds of Carbon Black annually.

14.  Carbon Black is an industry term used to describe a powdery commercial form of carbon. Carbon Black is made for use as a reinforcing agent and for its pigment in the manufacture of various products.  Tire Manufacturers are the main consumers of Carbon Black although the product has a wide variety of uses that include industrial rubber products, paints and plastics.

15.  Carbon Black manufacturing can cause air-polluting emissions when fuels like gasoline, diesel fuel and/or natural gas are not completely burned.  The resulting Carbon Black dust is black and sticky.  It is difficult to wipe or clean off of skin and it can be impossible to clean off of objects such as homes, buildings, cars and boats.

16.  Carbon Black particles often bind with other chemicals making them more hazardous than the actual end product, Carbon Black.  For example, polyaromatic hydrocarbons (also called "PAH's") are often used as particle coatings in Carbon Black.  When PAH's are combined with Carbon Black dust, the resulting product is a hazardous air-pollutant.

17.  The Occupational Safety and Health Administration ("OSHA") requires chemical manufacturers such as Continental to evaluate all products produced in the workplace to determine if they are hazardous.  Any chemical for which OSHA has established a permissible exposure limit ("PEL") is automatically considered hazardous.  According to OSHA regulations, Carbon Black is considered hazardous.

4

18.  Carbon Black contains constituents that are known as carcinogens such as Benzene or Benzol(a) Pyrene.  The carcinogenicity of Carbon Black has been clinically established in testing on laboratory animals.

19.  Repeated exposure to the inhalation of Carbon Black dust can cause lung scarring, and other respiratory-related health problems (including cancer).

20.  Material Safety Data Sheets provided by Continental to plant employees confirm that the potential adverse health problems caused by Carbon Black exposure include chronic inflammation of lung fibrosis and lung tumors.  Carbon Black dust can exacerbate pulmonary disease or asthma.

21.  Repeated exposure to Carbon Black dust particles causes damage to property such as buildings, homes, automobiles, boats, vegetation and other real and personal property that comes into contact with the substance.

22.  As a result of complaints by businesses and residents in the vicinity of the Continental Carbon plant in Phenix City, Alabama, the Environmental Protection Agency ("EPA") collected air pollution samples from various locations including Action Marine in Columbus, Georgia.  Samples taken at Action Marine were identified as containing as much as 75% Carbon Black particulate by the EPA and their experts.  These pollutants were identified as originating at the Continental Carbon Phenix City plant.

23.  As part of the Environmental Protection Agency's investigation of Continental, it was determined that Continental's Phenix City plant would intentionally cause or allow large concentrations of Carbon Black particles to be discharged, usually under the cover of darkness, thus producing air polluting dust that settles on the plaintiffs' property.  This practice of short, highly

concentrated Carbon Black discharges by Continental is classified by the EPA as the discharging of "fugitive emissions".

24.  The defendants have wrongfully and fraudulently concealed their practice of causing or allowing "fugitive emissions" of Carbon Black particles into the surrounding environment.  The defendants have concealed the fact that they are responsible for the discharge of toxic and harmful substances into the air and water from their Phenix City plant.

25  The defendants have engaged in a pattern and practice of manipulating test results and monitoring in order to claim that the Continental Phenix City plant has operated in compliance with applicable regulations when in fact the plaint's emissions have created damaging and dangerous pollution to the environment.

26.  In response to numerous complaints by citizens in the surrounding area, Continental has fraudulently maintained that it has not created the damages or caused the nuisance that continues to plague the area surrounding the plant.  The defendants know, or should have known, that Continental is intentionally damaging the plaintiffs and is causing a nuisance.

27.  At all times relevant to this Complaint, the defendants have knowingly and intentionally released Carbon Black dust into the environment in amounts which are harmful to human life and health, and damaging to property, as well as the general environment. The defendants have concealed this information from the plaintiffs and made no effort to warn the plaintiffs of the possible health risks resulting from exposure to Carbon Black dust.

28.  The defendants have wrongfully damaged, and are continuing to wrongfully damage, the environmental integrity of the area; causing property damage, and potential health risk to persons who come into contact with repeated Carbon Black dust exposure.

6

29. In committing the wrongful acts and omissions described herein, the defendants have acted clandestinely, illegally, intentionally, wantonly, willfully, fraudulently, negligently, and with gross negligence. The acts of the defendants were done without regard for the property of the class and adjacent property, and the environmental integrity of the surrounding land. Said acts were done without regard to the public health and safety of all plaintiffs. The defendants' acts were done in disregard of the defendants' duty of care to the public, and to these plaintiffs, in the creation and releasing of toxic particles and emissions. The defendants' conduct establishes a pattern and practice of intentional wrongful conduct, as well as actual malice. The plaintiffs allege that defendants are strictly liable for these actions for these actions in tort.

30. The wrongful conduct of the defendants as herein described constitutes a continuing violation in tort. The plaintiffs have been damaged and are continuing to be damaged by the wrongful acts of the defendants. The plaintiffs allege that the defendants must be immediately enjoined from their wrongful conduct.

31. As a direct and proximate result of the wrongful acts and omissions of the defendants in contaminating the air, land and water in the vicinity of the Continental Phenix City plant, plaintiffs have suffered and will continue to suffer damages, including, without limitation, the following:

(a) Damage to property such as automobiles, boats, buildings and structures that are stained with Carbon Black dust;

(b) Physical injury and impairment to their bodies as a result of inhaling Carbon Black dust;

(c) Injuries attributable to the reasonable fear and realistic threat of physical injury, impairment, pain and suffering and economic loss;

(d) Diminution of property values; and

7

(e)     Out-of-pocket costs associated with the cleaning of buildings, structures, landscapes, personal property, and all other items coated with the Carbon Black dust emitted from the Continental Phenix City plant.

## COUNT I

### Negligence

32.   The plaintiffs incorporate herein by reference Paragraphs 1 through 31 as if fully restated herein.

33.   Defendants are guilty of negligence because during their manufacturing process,  or through the process in which they supervise and control manufacturing, the defendants negligently discharged Carbon Black dust into the environment surrounding the Continental plant in Phenix City, Alabama. As a result of this wrongful conduct, the defendants have breached their standard of due care to the plaintiffs and as a direct and proximate result of defendants' negligence, the plaintiffs have been injured and damaged.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from defendants, actual, and compensatory damages in excess of SEVENTY-FIVE THOUSAND and NO/100 DOLLARS ($75,000.00), per class member,  together with interest, attorneys' fees, and other such relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proven at trial.

## COUNT II

### Wanton Conduct

34.  Plaintiffs incorporate herein by reference Paragraphs 1 through 33, as if fully restated herein.

8

35. For several years, the defendants have known of the seriousness and substantial risk of harm to human health and the environment caused by the release of Carbon Black dust and other pollutants into the air and waters in the vicinity of the Continental plant in Phenix City, Alabama. The defendants consciously and deliberately released these toxins and deny their conduct with the full understanding of the dangers and consequences to the plaintiffs. This conduct constitutes wantonness, said wantonness being a direct and proximate cause and/or contributing cause to the damages and injuries sustained by the plaintiffs. The acts of the defendants are willful, wanton, illegal, fraudulently, negligent and done in gross disregard for the property rights and health of the plaintiffs. As a direct result of the acts of the defendants, the plaintiffs are entitled to recover punitive damages. The conduct of the defendants also constitutes a pattern and practice of potential wrongful conduct which also was committed with actual malice.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from defendants, actual, and compensatory damages in excess of SEVENTY-FIVE THOUSAND and NO/100 DOLLARS ($75,000.00), per class member, together with interest, attorneys' fees, punitive damages and other such relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proven at trial.

## COUNT III

### Breach of Duty to Warn

36. The plaintiffs incorporate herein by reference Paragraphs 1 through 35 as if fully restated herein.

37. The defendants have participated in the manufacturer, creation, production, and use of Carbon Black dust and other related pollutants, and the release and dispersing of such pollutants into

9

the air and water surrounding the Continental Phenix City, Alabama plant. Because defendants created this hazard to human health, property and the environment, they had a duty to warn the plaintiffs of the inherent danger of the manufacture, creation, production, use, release and disbursements of these toxic compounds into the air. The defendants' failure to warn the plaintiffs and members of the surrounding community was negligent, willful, wanton, and in gross disregard for the property rights, safety, and legal rights of the plaintiffs and as a direct and proximate cause of the injuries and damages to the plaintiffs claimed herein.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from defendants, actual, and compensatory damages in excess of SEVENTY-FIVE THOUSAND and NO/100 DOLLARS ($75,000.00), per class member, together with interest, attorneys' fees, punitive damages and other such relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proven at trial.

## COUNT IV

### Fraud, Misrepresentation and Deceit

38. The plaintiffs incorporate herein by reference Paragraphs 1 through 37 as if fully restated herein.

39. The acts of the defendants in misrepresenting and concealing their release of Carbon Black dust and other pollutants, coupled with the defendants' knowledge of the serious danger caused thereby constitutes active fraud, misrepresentation and deceit, both actual and concealed, in violation of *Ala. Code* §§ 6-5-100 through 6-5-104. The fraud, misrepresentation and deceit of the defendants is a direct and proximate cause of the injuries and damages to the plaintiffs as alleged above.

10

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from defendants, actual, and compensatory damages in excess of SEVENTY-FIVE THOUSAND and NO/100 DOLLARS ($75,000.00), per class member, together with interest, attorneys' fees, punitive damages and other such relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proven at trial.

## COUNT V

### Nuisance

40. The plaintiffs incorporate herein by reference Paragraphs 1 through 39 as if fully restated herein.

41. Defendants are liable to each of the plaintiffs for callously, intentionally, wrongfully and illegally creating a private and public nuisance to the plaintiffs' rights of the use and enjoyment of their property, thereby damaging the plaintiffs, in their real and personal properties, plaintiffs' health and environment in general. The acts of the defendants are the direct and proximate cause of injuries and damages to the plaintiffs.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from defendants, actual, and compensatory damages in excess of SEVENTY-FIVE THOUSAND and NO/100 DOLLARS ($75,000.00), per class member, together with interest, attorneys' fees, punitive damages and other such relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proven at trial.

## COUNT VI

### Trespass

11

42. The plaintiffs incorporate herein by reference Paragraph 1 through 41 as if fully restated herein.

43. Defendants have intentionally and continuously committed trespass to each plaintiff's person, rights and property by releasing and dispersing toxic and harmful substances and compounds into the environments surrounding the Continental Phenix City plant. Defendants' trespass is a direct and proximate cause of injuries and damages to the plaintiffs.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from defendants, actual, and compensatory damages in excess of SEVENTY-FIVE THOUSAND and NO/100 DOLLARS ($75,000.00), per class member, together with interest, attorneys' fees, punitive damages and other such relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proven at trial.

## COUNT VII

### Common Law Strict Liability

44. The plaintiffs incorporate herein by reference Paragraphs 1 through 43 as if fully restated herein.

45. By manufacturing, producing, creating, using, releasing and dispersing toxic substances, pollutants and compounds into the environment surrounding Continental's Phenix City plant, the defendants have engaged in an abnormally dangerous, ultra hazardous and inherently or intrinsically dangerous activity for which they are strictly liable to the plaintiffs. Said conduct is a direct and proximate cause of injuries and damages to the plaintiffs.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from defendants, actual, and compensatory damages in excess of SEVENTY-FIVE THOUSAND and NO/100 DOLLARS

12

($75,000.00), per class member, together with interest, attorneys' fees, punitive damages and other such relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proven at trial.

## COUNT VIII

### Permanent Injunction

46. The plaintiffs incorporate herein by reference Paragraphs 1 through 45, as if fully restated herein.

47. The wrongful acts and conduct of the defendants as alleged herein, have and will continue to cause irreparable harm to the plaintiffs for which there is no adequate remedy other than a permanent injunction prohibiting such conduct by the defendants and requiring that they refrain from the negligent, willful, wanton, and illegal dispersing of pollutants and compounds into the air and water surrounding Continental Phenix City plant.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from defendants, actual, and compensatory damages in excess of SEVENTY-FIVE THOUSAND and NO/100 DOLLARS ($75,000.00), per class member, together with interest, attorneys' fees, and other such equitable relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proven at trial.

Respectfully submitted,

Jeff Friedman, FRI 018
Attorney for Plaintiffs

OF COUNSEL:
FRIEDMAN, LEAK & BLOOM
P. O. Box 43219
Birmingham, AL 35243-3219

14

Phone: (205) 278-7000
Fax: (205) 278-7001

_Jere L. Beasley_, BEA020
_Rhon E. Jones_, JON093
Attorneys for Plaintiffs

BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES
P. O. BOX 4260
Montgomery, AL 36103-4160
Phone: (334) 269-2343
Fax: (334) 334/269-2371

Daniel W. Lee, Esq.
THE OFFICES OF DANIEL W. LEE
208 W. Haralson Street
LaGrange, GA 30240
Phone: (706)812-1224
Fax: (706) 882-3677

Edward R. Jackson, Esq.
TWEEDY, JACKSON & BEECH
P. O. Box 748
Jasper, AL 35502-0748
Phone: (205) 387-2171
Fax: (205) 387-2174

**PLAINTIFFS REQUEST A TRIAL BY STRUCK JURY ON ALL ISSUES OF THIS CASE.**

**Please serve defendants by Certified Mail at:**

Continental Carbon Co.
c/o The Corporation Company
2000 Interstate Park Drive
Suite 204
Montgomery, AL 36109

China Synthetic Rubber Corporation
c/o The Corporation Company
2000 Interstate Park Drive
Suite 204

15

Montgomery, AL 36109


Taiwan Cement Corporation
c/o The Corporation Company
2000 Interstate Park Drive
Suite 204
Montgomery, AL 36109

Mr. Barry Nix
c/o Continental Carbon Co.
1500 State Docks Road
Phenix City, AL 36869

Mr. Todd Miller
c/o Continental Carbon Co.
1500 State Docks Road
Phenix City, AL 36869

16

**EXHIBIT B**

**AIG**  COMMERCIAL UMBRELLA DECLARATIONS

## NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

A CAPITAL STOCK COMPANY
ADMINISTRATIVE OFFICES
70 PINE STREET, NEW YORK, N.Y. 10270-0150

POLICY NUMBER: BE 7408845    RENEWAL OF: NEW

PRODUCER NAME: LOCKTON INS AGCY OF DALLAS, INC.

ADDRESS: 717 N HARWOOD STE 2700
DALLAS, TX 75201

ITEM 1.  NAMED INSURED: CONTINENTAL CARBON COMPANY (INC)

ADDRESS: 333 CYPRESS RUN STE 100
HOUSTON, TX 77094-1315

ITEM 2.  POLICY PERIOD: FROM: July 30, 2001    TO: July 30, 2002
AT 12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED SHOWN ABOVE.

ITEM 3.  LIMITS OF INSURANCE.

The Limits of Insurance, subject to all the terms of this policy, are:

A.  $25,000,000    Each Occurrence

B.  $25,000,000    General Aggregate (in accordance with Section III, Limits of Insurance)

C.  $25,000,000    Products-Completed Operations Aggregate (in accordance with Section III, Limits of Insurance)

D.  $10,000    Self Insured Retention

ITEM 4.  PREMIUM COMPUTATION

| ESTIMATED EXPOSURE | RATE / PER | ADVANCE PREMIUM | MINIMUM PREMIUM |
|---|---|---|---|
| $143,544,000 | FLAT | $92,107 | $92,107 |

ITEM 5.  ENDORSEMENTS ATTACHED:    SEE ATTACHED SCHEDULE

COUNTERSIGNED _____ DATE _____

BY _Walter R. Shelton_ AUTHORIZED REPRESENTATIVE

57886 (6/93)
A40016

---

## FORMS SCHEDULE

Named Insured:  CONTINENTAL CARBON COMPANY (INC)

Policy Number:  BE 7408845
Effective 12:01 AM:  July 30, 2001

| Endt. No. | Form Name | Form Number/Edition Date |
|---|---|---|
| | COMM UMB DEC NAT UNION OF PA | 57896 (06/93) |
| | COMM UMB POL FORM | 57897 (06/93) |
| | SCHEDULE OF UNDERLYING INS | UNDSCH (05/99) |
| 1 | TX NOTICE | 53592 (05/92) |
| 2 | NAMED INSURED SCHEDULE | MNSCPT (07/01) |
| 3 | TEXAS MANDATORY | 61186 (06/97) |
| 4 | UNINTENTIONAL ERRORS AND OMISSIONS | 62222 (03/95) |
| 5 | NOTICE OF OCCURRENCE | 62223 (03/95) |
| 6 | KNOWLEDGE OF OCCURRENCE | 62224 (03/95) |
| 7 | EMPL BENFTS LIAB FOLLOW-FORM CLM MADE V2 | 62081 (02/95) |
| 8 | PROFESSIONAL LIAB EXCL | 80458 (05/94) |
| | CROSS SUITS EXCL | 60441 (05/94) |
| 9 | CRISIS RESPONSE AND EXCESS CASUALTY CRISIS FUND | 74641 (12/99) |
| 10 | EMPLOYERS LIAB FOLLOW FORM | 59429 (01/98) |
| 11 | FOREIGN LIABILITY FOLLOW-FORM ENDR | 57710 (03/93) |
| 12 | NAMED PERIL/TIME ELEMENT POLLUTION ENDT.VER2 (O-S) | 65581 (03/96) |
| 13 | POLICY CHANGE ENDORSEMENT | MINSCPT (07/01) |

CIRMSC
CI0228

# Commercial Umbrella Policy Form

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "we", "us" and "our" refer to the Company providing this insurance. The word "Insured" means any person or organization qualifying as such in Insuring Agreement IV, Definitions.

In consideration of the payment of the premium and in reliance upon the statements in the Declarations we agree with you to provide coverage as follows:

## Insuring Agreements

### I. Coverage

We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract, because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that takes place during this Policy Period and is caused by an Occurrence happening anywhere in the world. The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.

If we are prevented by law or statute from paying on behalf of the Insured, then we will, where permitted by law or statute, indemnify the Insured for those sums in excess of the Retained Limit.

### II. Defense

A. We shall have the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when:

   1. The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the Insured have been exhausted by payment of claims to which the policy applies; or

   2. Damages are sought for Bodily Injury, Property Damage, Personal Injury or Advertising Injury covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured.

B. When we assume the defense of any claim or suit:

   1. We will defend any suit against the Insured seeking damages on account of Bodily Injury, Property Damage, Personal Injury or Advertising Injury even if such suit is groundless, false or fraudulent, but we have the right to investigate, defend and settle the claim as we deem expedient.

   2. We will pay the following, to the extent that they are not included in the underlying policies listed in the Schedule of Underlying Insurance or in any other insurance providing coverage to the Insured:

      a. premiums on bonds to release attachments for amounts not exceeding our Limits of Insurance, but we are not obligated to apply for or furnish any such bond;

      b. premiums on appeal bonds required by law to appeal any claim or suit we defend, but we are not obligated to apply for or furnish any such bond;

      c. all costs taxed against the Insured in any claim or suit we defend;

      d. pre-judgment interest awarded against the Insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any pre-judgment interest based on that period of time after the offer.

      e. all interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court the part of the judgment that is within our applicable Limit of Insurance;

      f. the Insured's expenses incurred at our request.

   We will not defend any suit or claim after our applicable Limits of Insurance have been exhausted by payment of judgments or settlements.

   All expenses we incur in the defense of any suit or claim are in addition to our Limits of Insurance.

C. In all other insurance except A. above, we will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the Insured. We will, however, have the right and shall be given the opportunity to participate in the defense and trial of any claim, suits or proceedings relative to any Occurrence which, in our opinion, may create liability on our part under the terms of this policy. If we exercise such right, we will do so at our own expense.

### III. Limits of Insurance

A. The Limits of Insurance shown in Item 3 of the Declarations and the rules below state the most we will pay regardless of the number of:

   1. Insureds;

   2. Claims made or suits brought; or

   3. Persons or organizations making claims or bringing suits.

B. The General Aggregate Limit is the most we will pay for all damages covered under Insuring Agreement I except:

   1. Damages included in the Products-Completed Operations Hazard; and

   2. Coverages included in the policies listed in the Schedule of Underlying Insurance to which no underlying aggregate limit applies.

C. The Products-Completed Operations Aggregate Limit is the most we will pay for all damages included in the Products-Completed Operations Hazard.

D. Subject to B. and C. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of damages covered under Insuring Agreement I because of all Bodily Injury, Property Damage, Personal Injury and Advertising Injury arising out of any one Occurrence.

   If the applicable limits of insurance of the policies listed in the Schedule of Underlying Insurance or of other insurance providing coverage to the Insured are reduced or exhausted by payment of one or more claims that would be Insured by our policy we will:

   1. In the event of reduction, pay in excess of the reduced underlying limits of insurance; or

   2. In the event of exhaustion of the underlying limits of insurance, continue in force as underlying insurance.

   The Limits of Insurance of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

E. Retained Limit

We will be liable only for that portion of damages in excess of the Insured's Retained Limit which is defined as the greater of either:

1. The total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the Insured; or

2. The amount stated in the Declarations as Self Insured Retention as a result of any one Occurrence not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other underlying insurance providing coverage to the Insured;

and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.

IV. Definitions

A. Advertising Injury means injury arising solely out of your advertising activities as a result of one or more of the following offenses:

1. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

2. Oral or written publication of material that violates a person's right of privacy;

3. Misappropriation of advertising ideas or style of doing business; or

4. Infringement of copyright, title or slogan.

B. Auto means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But auto does not include mobile equipment.

C. Bodily Injury means bodily injury, sickness, disability or disease. Bodily injury shall also mean mental injury, mental anguish, humiliation, shock or death if directly resulting from bodily injury, sickness, disability or disease.

D. Impaired Property means tangible property, other than Your Product or Your Work, that cannot be used or is less useful because:

1. It incorporates Your Product or Your Work that is known or thought to be defective, deficient, inadequate or dangerous; or

2. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

1. The repair, replacement, adjustment or removal of Your Product or Your Work; or

2. Your fulfilling the terms of the contract or agreement.

E. Insured means each of the following, to the extent set forth:

1. The Named Insured, meaning:

a. any person or organization listed in Item 1 of the Declarations, and any company that is your subsidiary or of the effective date of this policy and any company you own or control as of the effective date of this policy; and

b. any organization newly acquired, controlled or formed by you during the policy period but only.

1) as respects Occurrences taking place after you acquire, take control or form such organization;

2) if such organization is included under the coverage provided by the policies listed in the Schedule of Underlying Insurance; and

3) if you give us prompt notice after you acquire, take control or form such organization.

We may make an additional premium charge for any additional organizations you acquire, form or take control of during the period of this policy.

2. If you are an individual, you and your spouse, but only with respect to the conduct of a business of which you are the sole owner.

3. If you are a partnership or joint venture, the partners or members and their spouses but only as respects the conduct of your business.

No person or organization is an Insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

4. Any person or organization, other than the Named Insured, included as an additional insured in the policies listed in the Schedule of Underlying Insurance but not for broader coverage than is available to such person or organization under such underlying policies.

5. Any of your partners, executive officers, directors, stockholders or employees but only while acting within their duties.

However, the coverage granted by this provision 5, does not apply to the ownership, maintenance, use, loading or unloading of any autos, aircraft or watercraft unless such coverage is included under the policies listed in the Schedule of Underlying Insurance and then for no broader coverage than is provided under such underlying policies.

6. Any person, other than one of your employees, or organization while acting as your real estate manager.

7. Any person, organization, trustee or estate to whom you are obligated by a written Insured Contract to provide insurance such as is afforded by this policy but only with respect to:

a. liability arising out of operations conducted by you or on your behalf; or

b. facilities owned or used by you.

8. Any person (other than your partners, executive officers, directors, stockholders or employees) or organization with respect to any auto owned by you, loaned to you or hired by you or your behalf and used with your permission.

However, the coverage granted by this provision 8, does not apply to any person using an auto while working in a business that sells, services, repairs or parks autos unless you are in that business.

F. Insured Contract means any oral or written contract or agreement entered into by you and pertaining to your business under which you assume the tort liability of another party to pay for Bodily Injury, Property Damage, Personal Injury or Advertising Injury to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

G. Mobile Equipment means any of the following types of land vehicles, including any attached machinery or equipment:

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2. Vehicles maintained for use solely on or next to premises you own or rent;

4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5. Oral or written publication of material that violates a person's right of privacy.

J. Products-Completed Operations Hazard includes all Bodily Injury and Property Damage occurring away from premises you own or rent and arising out of Your Product or Your Work except:

   a. products that are still in your physical possession; or

   b. work that has not yet been completed or abandoned.

2. Your Work will be deemed completed at the earliest of the following times:

   a. When all of the work called for in your contract has been completed.

   b. When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

   c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

3. This hazard does not include Bodily Injury or Property Damage arising out of:

   a. the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the loading or unloading of it;

   b. the existence of tools, uninstalled equipment or abandoned or unused materials.

K. Property Damage means:

1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the Occurrence that caused it.

L. Suit means a civil proceeding in which Bodily Injury, Property Damage, Personal Injury or Advertising Injury to which this insurance applies is alleged. Suit includes:

1. An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

2. Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

M. Your Product means:

1. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   a. you;

   b. others trading under your name; or

   c. a person or organization whose business or assets you have acquired; and

2. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

---

3. Vehicles that travel on crawler treads;

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   a. power cranes, shovels, loaders, diggers or drills; or

   b. road construction or resurfacing equipment such as graders, scrapers or rollers;

5. Vehicles not described in 1., 2., 3., or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   a. air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   b. cherry pickers and similar devices used to raise or lower workers;

6. Vehicles not described in 1., 2., 3., or 4. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not mobile equipment but will be considered autos:

   a. equipment designed primarily for:

      1) snow removal;

      2) road maintenance, but not construction or resurfacing; or

      3) street cleaning;

   b. cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   c. air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

H. Occurrence means:

1. As respects Bodily Injury or Property Damage, an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured. All such exposure to substantially the same general conditions shall be considered as arising out of one Occurrence;

2. As respects Personal Injury, an offense arising out of your business that results in Personal Injury. All damages that arise from the same or related injurious material or act shall be considered as arising out of one Occurrence, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants; and

3. As respects Advertising Injury, an offense committed in the course of advertising your goods, products and services that results in Advertising Injury. All damages that arise from the same or related injurious material or act shall be considered as arising out of one Occurrence, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

I. Personal Injury means injury other than Bodily Injury or Advertising Injury arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Malicious prosecution;

3. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

N. Your Product includes:

1. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of Your Product; and

2. The providing of or failure to provide warnings or instructions.

Your Product does not include vending machines or other property rented to or located for the use of others but not sold.

O. Your Work means:

1. Work or operations performed by you or on your behalf; and

2. Materials, parts or equipment furnished in connection with such work or operations.

Your Work includes:

1. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of Your Work; and

2. The providing of or failure to provide warnings or instructions.

V. Exclusions

This insurance does not apply to:

A. Any obligation of the Insured under a Workers Compensation, Unemployment Compensation or Disability Benefits Law, or under any similar law.

B. Any obligation of the Insured under the Employees' Retirement Income Security Act of 1974 or any amendments to the act.

C. Any obligation of the Insured under a "No Fault", "Uninsured Motorist" or "Underinsured Motorist" law.

D. Property Damage to:

1. Property you own, rent, occupy or use;

2. Personal property in the care, custody or control of the Insured.

E. Property Damage to Impaired Property or property that has not been physically injured, arising out of:

1. A defect, deficiency, inadequacy or dangerous condition in Your Product or Your Work; or

2. A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to Your Product or Your Work after it has been put to its intended use.

F. Property Damage to Your Product arising out of it or any part of it.

G. Property Damage to Your Work arising out of it or any part of it and included in the Products-Completed Operations Hazard.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(7)

57887 (6/93)
AH0004

H. Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

1. Your Product;

2. Your Work; or

3. Impaired Property

If such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

I. Liability of any employee with respect to Bodily Injury or Personal Injury to another employee of the same employer injured in the course of such employment.

However, if insurance for such liability is provided by a policy listed in the Schedule of Underlying Insurance:

1. This exclusion shall not apply; and

2. The insurance provided by our policy will not be broader than the insurance coverage provided to the employee by the policy listed in the Schedule of Underlying Insurance.

J. Bodily Injury or Property Damage arising out of the ownership, maintenance, operation, use, loading or unloading of any watercraft or any aircraft owned by the Insured or rented to the Insured without a crew.

However, if insurance for such Bodily Injury or Property Damage is provided by a policy listed in the Schedule of Underlying Insurance.

1. This exclusion shall not apply; and

2. The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

K. Personal Injury or Advertising Injury:

1. Arising out of oral or written publication of material, if done by or at the direction of the Insured with knowledge of its falsity;

2. Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

3. Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the Insured; or

4. For which the Insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the Insured would have in the absence of the contract or agreement.

L. Advertising Injury arising out of:

1. Breach of contract, other than misappropriation of advertising ideas under an implied contract;

2. The failure of goods, products or services to conform with advertised quality or performance;

3. The wrong description of the price of goods, products or services; or

4. An offense committed by an Insured whose business is advertising, broadcasting, publishing or telecasting.

(8)

57887 (6/93)
AH0004

**M.**

1. Bodily Injury, Property Damage or Personal Injury arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world:

2. Any loss, cost or expense arising out of any governmental direction or request that we, the Insured or any other person or organization test for, monitor, clean-up, remove, contain, treat, detoxify, neutralize or assess the effects of pollutants; or

3. Any loss, cost, or expense, including but not limited to costs of investigation or attorneys' fees, incurred by or on behalf of an Insured, or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize pollutants.

This exclusion M. shall not apply to Bodily Injury, Property Damage or Personal Injury arising out of:

a. Heat, smoke or fumes from a hostile fire;

b. The upset, overturn or collision of a motor vehicle; or

c. The Products-Completed Operations Hazard;

if insurance for such Bodily Injury, Property Damage or Personal Injury is provided by a policy listed in the Schedule of Underlying Insurance. However, the insurance provided by our policy for such Bodily Injury, Property Damage or Personal Injury will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

As used in this exclusion:

a. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. "Waste material" includes materials which are intended to be or have been recycled, reconditioned or reclaimed;

b. A "hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**N.** Bodily Injury or Property Damage due to war, whether or not declared, or any act or condit ion incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**O.** Bodily Injury or Property Damage expected or intended from the standpoint of the Insured. However, this exclusion does not apply to Bodily Injury resulting from the use of reasonable force to protect persons or property.

**P.**

1. Bodily Injury, Property Damage or Personal Injury arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

2. Any obligation of the Insured to indemnify any party because of damages arising out of such Bodily Injury, Property Damage or Personal Injury as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust; or

3. Any obligation to defend any suit or claim against the Insured alleging Bodily Injury, Property Damage or Personal Injury and seeking damages, if such suit or claim arises from Bodily Injury, Property Damage or Personal Injury as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

**Q.** Bodily Injury or Personal Injury to:

1. A person arising out of any:

a. Refusal to employ that person;

b. Termination of that person's employment; or

c. Employment-related practices, policies, acts or omissions such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

2. The spouse, child, parent, brother or sister of that person as a consequence of Bodily Injury or Personal Injury to that person at whom any of the employment-related practices described in paragraph a., b. or c. above is directed.

This exclusion applies:

1. Whether the Insured may be liable as an employer or in any other capacity; and

2. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**R.** Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of or by reason of:

1. The purchase, sale, offer of sale, or solicitation of any security, debt, bank deposit or financial interest or instrument;

2. Any representations made at any time in relation to the price or value of any security, debt, bank deposit or financial interest or instrument; or

3. Any depreciation or decline in price or value of any security, debt, bank deposit or financial interest or instrument.

**S.** Bodily Injury or Property Damage for which any Insured may be held liable by reason of:

1. Causing or contributing to the intoxication of any person;

2. The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

3. Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

However, if insurance for such Bodily Injury or Property Damage is provided by a policy listed in the Schedule of Underlying Insurance:

1. This exclusion shall not apply; and

2. The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

**T.** Bodily Injury or Property Damage:

1. a. with respect to which the Insured is also an Insured under a nuclear energy liability policy issued by the Nuclear Energy Liability-Property Insurance Assoc., Mutual Atomic Energy Liability Underwriters or the Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

1.

b. resulting from the hazardous properties of nuclear material and with respect to which (1) any person or any organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, (2) the Insured is, or had this policy not been available would be, entitled to indemnity from the United States of America or any agency thereof, under any agreement entered into by the United States of America or any agency thereof, with any person or organization.

2. Bodily Injury or Property Damage resulting from the hazardous properties of nuclear material, if:

a. the nuclear material (1) is at any nuclear facility owned by the Insured or operated by the Insured or on the Insured's behalf, or (2) has been discharged or dispersed therefrom;

b. the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by the Insured or on the Insured's behalf; or

c. the Bodily Injury or Property Damage arises out of the furnishing by the Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion applies only to Property Damage to such nuclear facility and any property thereat.

3. As used in this exclusion:

a. "hazardous properties" includes radioactive, toxic or explosive properties;

b. "nuclear material" means source material, special nuclear material or by-product material;

c. "source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

d. "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

e. "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility below;

f. "nuclear facility" means:

1) any nuclear reactor;

2) any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing or packaging wastes;

3) any equipment or device used for the processing, fabricating, or alloying of special nuclear material if at any time the total amount of such material in the Insured's custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

4) any structure, basin, excavation, premises or place prepared or used for storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

g. "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

(11)

INSURED'S COPY

57697 (8/93)
AH0034

---

b. Property Damage includes all forms of radioactive contamination of property.

1. Conditions

A. Appeals

If the Insured or the Insured's underlying insurers do not appeal a judgment in excess of the Retained Limit, we have the right to make such an appeal. If we elect to appeal, our liability on such an award or judgment shall not exceed our Limits of Insurance as stated in Item 3 of the Declarations plus the cost and expense of such appeal.

B. Audit

We may audit and examine your books and records as they relate to this policy at any time during the period of this policy and for up to three years after the expiration or termination of this policy.

C. Bankruptcy or Insolvency

Your bankruptcy, insolvency or inability to pay or the bankruptcy, insolvency or inability to pay of any of your underlying insurers will not relieve us from the payment of any claim covered by this policy.

But under no circumstances will such bankruptcy, insolvency or inability to pay require us to drop down and replace the Retained Limit or assume any obligation within the Retained Limit area.

D. Cancellation

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2. We may cancel this policy. If we cancel because of non-payment of premium, we must mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than ninety (90) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Declarations will be sufficient to prove notice.

3. The policy period will end on the day and hour stated in the cancellation notice.

4. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the Minimum Premium as shown in Item 4 of the Declarations.

5. If you cancel, final premium will be more than pro rata; it will be based on the time the policy was in force and increased by our short rate cancellation table and procedure. Final premium will not be less than the short rate share of the Minimum Premium as shown in Item 4 of the Declarations.

6. Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representative's check, mailed or delivered, shall be sufficient tender of any refund due you.

7. The first Named Insured in Item 1 of the Declarations shall act on behalf of all other Insureds with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

8. Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

(12)

INSURED'S COPY

57697 (8/93)
AH0034

E. **Changes**

Notice to any agent or knowledge possessed by any agent or by any other person will not effect a waiver or a change in any part of this policy. This policy can only be changed by a written endorsement that becomes a part of this policy and that is signed by one of our authorized representatives.

F. **Duties In The Event Of An Occurrence, Claim Or Suit**

1. You must see to it that we are notified as soon as practicable of an Occurrence which may result in a claim under this policy. To the extent possible, notice should include:

   a. how, when and where the Occurrence took place;

   b. the names and addresses of any injured persons and witnesses; and

   c. the nature and location of any injury or damage arising out of the Occurrence.

2. If a claim is made or suit is brought against any Insured that is reasonably likely to involve this policy you must notify us in writing as soon as practicable.

3. You and any other involved Insured must:

   a. immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

   b. authorize us to obtain records and other information;

   c. cooperate with us in the investigation, settlement or defense of the claim or suit; and

   d. assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of injury or damage to which this insurance may apply.

4. No Insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

G. **Inspection**

We have the right, but are not obligated, to inspect your premises and operations at any time. Our inspections are not safety inspections. They relate only to the insurability of your premises and operations and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person or organization to provide for the health or safety of your employees or the public. We do not warrant that your premises or operations are safe or healthful or that they comply with laws, regulations, codes or standards.

H. **Legal Actions Against Us**

There will be no right of action against us under this insurance unless:

1. You have complied with all the terms of this policy; and

2. The amount you owe has been determined with our consent or by actual trial and final judgment.

This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability.

I. **Maintenance of Underlying Insurance**

During the period of this policy, you agree:

1. To keep the policies listed in the Schedule of Underlying Insurance in full force and effect;

(13)

67697 (6/93)
AH0004

2. That any renewals or replacements of the policies listed in the Schedule of Underlying Insurance will not be more restrictive in coverage;

3. That the limits of insurance of the policies listed in the Schedule of Underlying Insurance shall not change except for any reduction or exhaustion of aggregate limits by payment of claims for Occurrences covered by this policy; and

4. That the terms, conditions and endorsements of the policies listed in the Schedule of Underlying Insurance will not materially change during the period of this policy.

If you fail to comply with these requirements, we will only be liable to the same extent that we would had you fully complied with these requirements.

J. **Other Insurance**

If other valid and collectible insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

K. **Premium**

The first Named Insured designated in Item 1 of the Declarations shall be responsible for payment of all premiums when due.

The premium for this policy shall be computed on the basis set forth in Item 4 of the Declarations. At the beginning of the policy period, you must pay us the Advance Premium shown in Item 4 of the Declarations.

When this policy expires or if it is cancelled, we will compute the earned premium for the time this policy was in force. If this policy is subject to audit adjustment, the actual exposure basis will be used to compute the earned premium. If the earned premium is greater than the Advance Premium, you will promptly pay us the difference. If the earned premium is less than the Advance Premium, we will return the difference to you. But in any event we shall retain the Minimum Premium as shown in Item 4 of the Declarations for each twelve months of our policy period.

L. **Prior Insurance**

If a loss covered by this policy is also covered in whole or in part under any other excess policy issued to the Insured prior to the effective date of this policy, our Limits of Insurance as stated in Item 3 of the Declarations will be reduced by any amounts due the Insured under such prior insurance.

M. **Separation of Insureds**

Except with respect to our Limits of Insurance and any rights or duties specifically assigned to the first Named Insured designated in Item 1 of the Declarations, this insurance applies:

1. As if each Named Insured were the only Named Insured; and

2. Separately to each Insured against whom claim is made or suit is brought.

N. **Subrogation**

If any Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The Insured must do nothing after loss to impair these rights and must help us enforce them.

Any recoveries shall be applied as follows:

1. Any interest, including the Insured, that have paid an amount in excess of our payment under this policy will be reimbursed first;

(14)

67697 (6/93)
AH0004

## SCHEDULE OF UNDERLYING INSURANCE

Issued to: CONTINENTAL CARBON COMPANY (INC)    Policy Number: BE  7408945

*If NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

| TYPE OF POLICY OR COVERAGE | INSURER, POLICY NO. AND POLICY PERIOD | LIMITS |
|---|---|---|
| GENERAL LIABILITY | ASLC<br>07/30/01<br>07/30/02 | $1,000,000<br>EACH OCCURRENCE<br>$2,000,000<br>GENERAL AGGREGATE<br>$2,000,000<br>PRODUCTS/C. OPS. AGGREGATE |
| AUTOMOBILE LIABILITY | COMMERCE & INDUSTRY<br>07/30/01<br>07/30/02 | $1,000,000<br>COMBINED SINGLE LIMIT |
| FOREIGN GL LIABILITY | INS CO OF STATE OF PA<br>07/30/01<br>07/30/02 | $1,000,000<br>EACH OCCURRENCE<br>$1,000,000<br>GENERAL AGGREGATE<br>$1,000,000<br>PRODUCTS/C. OPS. AGGREGATE |
| FOREIGN AL LIABILITY | INS CO OF STATE OF PA<br>07/30/01<br>07/30/02 | $1,000,000<br>COMBINED SINGLE LIMIT |
| EMPLOYERS LIABILITY (TEXAS) | TEXAS WC INSURANCE FUND<br>07/30/01<br>07/30/02 | $1,000,000<br>EACH ACCIDENT<br>$1,000,000<br>DISEASE EACH EMPLOYEE<br>$1,000,000<br>DISEASE POLICY LIMIT |
| EMPLOYERS LIABILITY (FOREIGN) | INS CO OF STATE OF PA<br>07/30/01<br>07/30/02 | $1,000,000<br>EACH ACCIDENT<br>$1,000,000<br>DISEASE EACH EMPLOYEE<br>$1,000,000<br>DISEASE POLICY LIMIT |

INSURED'S COPY

LNDSCH (6/99)
AH0006

---

2.   We then will be reimbursed up to the amount we have paid; and

3.   Lastly, any interest, including the insured, over which our insurance is excess, are entitled to claim this residue.

Expenses incurred in the exercise of rights of recovery shall be apportioned between the interests, including the insured, in the ratio of their respective recoveries as finally settled.

O.   Transfer Of Your Rights And Duties

Your rights and duties under this policy may not be transferred without our written consent.

If you die or are legally declared bankrupt, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. However, notice of cancellation sent to the first Named Insured designated in Item 1 of the Declarations and mailed to the address shown in this policy will be sufficient notice to effect cancellation of this policy.

P.   When Loss Is Payable

Coverage under this policy will not apply unless and until the insured or the insured's underlying insurer is obligated to pay the Retained Limit.

When the amount of loss has finally been determined, we will promptly pay on behalf of the insured the amount of loss falling within the terms of this policy.

You shall promptly reimburse us for any amount within the Self Insured Retention paid by us on behalf of an insured.

In Witness Whereof, we have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by one of our duly authorized representatives, where required by law.

*Elizabeth M. Tuck*
SECRETARY

*Susan Riviera*
PRESIDENT

(15)

INSURED'S COPY

57697 (6/93)
AH0004

## SCHEDULE OF UNDERLYING INSURANCE

Issued to: CONTINENTAL CARBON COMPANY (INC)

Policy Number: BE  7408845

by: NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PA.

| TYPE OF POLICY OR COVERAGE | INSURER, POLICY NO. AND POLICY PERIOD | LIMITS |
|---|---|---|
| EMPLOYERS LIABILITY (OTHER STATES) | FIREMANS FUND | $1,000,000 EACH ACCIDENT $1,000,000 DISEASE EACH EMPLOYEE $1,000,000 DISEASE POLICY LIMIT |
| EMPLOYERS LIABILITY (OKLAHOMA) | STATE INS FUND OF OKLA 07/30/01 07/30/02 | $1,000,000 EACH ACCIDENT $1,000,000 DISEASE EACH EMPLOYEE $1,000,000 DISEASE POLICY LIMIT |
| EMPLOYEE BENEFITS LIABILITY | AISLC 07/30/01 07/30/02 | $1,000,000 EACH OCCURRENCE $1,000,000 GENERAL AGGREGATE |

AUTHORIZED REPRESENTATIVE

LINDSCH (5/99)
AH-0006

---

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A.
70 PINE STREET
NEW YORK, NEW YORK 10270

### TEXAS NOTICE

**IMPORTANT NOTICE**

To obtain information or make a complaint:

You may call National Union Fire Insurance Company of Pittsburgh, PA's toll-free telephone number for information or to make a complaint at:

1-800-553-6938

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

1-800-252-3439

You may write the Texas Department of Insurance
P.O. Box 149104
Austin, TX 78714-9104
Fax # (512) 475-1771

**PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact the agent first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY.** This notice is for information only and does not become a part of the attached document.

**AVISO IMPORTANTE**

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis de National Union Fire Insurance Company of Pittsburgh, PA's para informacion o para someter una queja al:

1-800-553-6938

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

1-800-252-3439

Puede escribir al Departamento de Seguros de Texas
P.O. Box 149104
Austin, TX 78714-9104
Fax # (512) 475-1771

**DISPUTAS SOBRE PRIMAS O RECLAMOS:** Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

53582 (5/92)
AH-0570

INSURED'S COPY

## ENDORSEMENT No. 1

This endorsement, effective 12:01 AM:  July 30, 2001

Forms a part of policy no.:  BE   7409845

Issued to:  CONTINENTAL CARBON COMPANY (INC)

By:  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### NAMED INSURED SCHEDULE

Continental Carbon Company
CRSG USA Corp.
CCC Transport
Posh Investments Ltd.
Continental Carbon India Ltd.

---

## ENDORSEMENT No. 2

This endorsement, effective 12:01 AM:  July 30, 2001

Forms a part of policy no.:  BE   7409845

Issued to:  CONTINENTAL CARBON COMPANY (INC)

By:  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### COMMERCIAL UMBRELLA
### TEXAS AMENDATORY ENDORSEMENT

In Section V, Exclusions, the definition of "waste" in subsection 3.e. of Exclusion T is hereby deleted in its entirety and replaced by the following:

e. "Waste" means any waste material (1) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (2) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

In Section VI, Conditions, Condition D, Cancellation, is hereby deleted in its entirety and replaced by the following:

**D.  Cancellation and Nonrenewal**

Cancellation

1.  You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2.  New policies in effect for sixty (60) days or less.

    We may cancel this policy. If we cancel because of non-payment of premium, we must mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than ninety (90) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Declarations will be sufficient to prove notice.

3.  New policies in effect for more than sixty (60) days and any renewal policy.

    We may not cancel this policy unless the cancellation is based on one or more of the following reasons:

    a)  fraud in obtaining coverage;

    b)  failure to pay premiums when due;

    c)  an increase in hazard within the control of the Insured which would produce an increase in rate;

    d)  loss of our reinsurance covering all or part of the risk covered by the policy; or

    e)  our being placed in supervision, conservatorship, or receivership, if the cancellation or nonrenewal is approved or directed by the supervisor, conservator, or receiver.

4.  We shall mail or deliver to the first Named Insured at the address shown in the policy written notice of cancellation not less than the 10th day before the date on which the cancellation takes effect. Such written notice shall state the reason or reasons for cancellation.

Authorized Representative
or countersignature (where required by law)

60186 (6/97)
AH-015B

Page 1 of 2

Rev. 2/98

"INSURED'S COPY"

## ENDORSEMENT No. 3

This endorsement, effective 12:01 AM: July 30, 2001

Forms a part of policy no.: BE 7406845

Issued to: CONTINENTAL CARBON COMPANY OF PITTSBURGH (INC)

By: NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH-PA.

### UNINTENTIONAL ERRORS OR OMISSIONS ENDORSEMENT

Your failure to disclose all hazards existing as of the inception date of the policy shall not prejudice you with respect to the coverage afforded by this policy provided such failure or any omission is not intentional.

All other terms and conditions of this policy remain unchanged.

_____

AUTHORIZED REPRESENTATIVE

62222 (03/95)
AH0273

---

5. We may not cancel this policy based solely on the fact that the Insured is an elected official.

6. The policy period will end on the day and hour stated in the cancellation notice.

7. If we cancel, final premium will be calculated pro rata; it will be based on the time this policy was in force. Final premium will not be less than the pro rata share of the Minimum Premium as shown in Item 4 of the Declarations.

8. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure. Final premium will not be less than the short rate share of the Minimum Premium as shown in Item 4 of the Declarations.

9. Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter, but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representative's check, mailed or delivered, shall be sufficient tender of any refund due you.

10. The first Named Insured in Item 1 of the Declarations shall act on behalf of all other Insureds with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

11. Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

**Nonrenewal**

1. We may refuse to renew this policy by delivering or mailing to the first Named Insured written notice of nonrenewal at the address shown on the policy. Such written notice shall state the reason(s) for nonrenewal. The notice must be delivered or mailed not later than the 60th day before the date on which the policy expires. If the notice is delivered or mailed later than the 60th day before the date on which the policy expires, coverage shall remain in effect until the 61st day after the date on which notice is delivered or mailed. Earned premium for any period of coverage that extends beyond the expiration date of the policy shall be computed pro rata based on the previous year's rates.

2. The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

3. We may not refuse to renew this policy based solely on the fact that the Insured is an elected official.

In Section VI, Conditions, the following condition is hereby added:

O. Notice Of Settlement Of Liability Claims

1. We shall notify you in writing of an initial offer to compromise or settle a claim against you made under this policy. The notice shall be given not later than the 10th day after the date on which the offer is made.

2. We shall notify you in writing of any settlement of a claim against you made under this policy. This notice shall be given not later than the 30th day after the date of settlement.

All other terms and conditions of this policy remain unchanged.

_____

AUTHORIZED REPRESENTATIVE

60166 (6/97)
AH0158
Page 2 of 2
Rev. 2/98

ENDORSEMENT No. 4

This endorsement, effective 12:01 AM:   July 30, 2001

Forms a part of policy no.:   BE   7408845

Issued to:   CONTINENTAL CARBON COMPANY (INC)

By:   NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

NOTICE OF OCCURRENCE ENDORSEMENT

Your failure to give first report of a claim to us shall not invalidate coverage under this policy if the loss was inadvertently reported to another insurer.  However, you shall report any such Occurrence to us within a reasonable time once you become aware of such error.

All other terms, conditions and exclusions remain the same.

AUTHORIZED REPRESENTATIVE

INSURED'S COPY

62223 (3/95)
AH0274

---

ENDORSEMENT No. 5

This endorsement, effective 12:01 AM:   July 30, 2001

Forms a part of policy no.:   BE   7408845

Issued to:   CONTINENTAL CARBON COMPANY (INC)

By:   NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

KNOWLEDGE OF OCCURRENCE ENDORSEMENT

As respects any loss reporting requirements under this policy, it is understood and agreed that knowledge of an accident or incident by an agent, servant or employee of yours or any other person shall not in itself constitute knowledge by you, unless a corporate officer of yours shall have received notice from said agent, servant, employee or any other person.

All other terms, conditions and exclusions remain the same.

AUTHORIZED REPRESENTATIVE

INSURED'S COPY

62224 (3/95)
AH0275

## ENDORSEMENT No. 7

This endorsement, effective 12:01 AM:  July 30, 2001

Forms a part of policy no.:  BE   7408845

Issued to:  CONTINENTAL CARBON COMPANY (INC)

By:  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### PROFESSIONAL LIABILITY EXCLUSION

This insurance does not apply to **Bodily Injury, Property Damage, Personal Injury or Advertising Injury** arising out of any act, error, omission, malpractice or mistake of a professional nature committed by the insured or any person for whom the insured is legally responsible.

All other terms and conditions of this policy remain unchanged.

AUTHORIZED REPRESENTATIVE

60458 (5/94)
AH0200

INSURED'S COPY

---

## ENDORSEMENT No. 6

This endorsement, effective 12:01 AM:  July 30, 2001

Forms a part of policy no.:  BE   7408845

Issued to:  CONTINENTAL CARBON COMPANY (INC)

By:  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### EMPLOYEE BENEFITS LIABILITY FOLLOW-FORM ENDORSEMENT (CLAIMS MADE VERSION 2)

### PROVIDES CLAIMS MADE COVERAGE - PLEASE READ CAREFULLY

This insurance does not apply to **Bodily Injury, Property Damage, Personal Injury or Advertising Injury** arising out of any negligent act, error or omission of the **insured** or of any other person for whom the **insured** is legally liable in the administration of the **insured's Employee Benefit Programs** as defined herein.

However, if insurance for such **Bodily Injury, Property Damage, Personal Injury or Advertising Injury** is provided by a policy listed in the Schedule of Underlying Insurance;

1. This exclusion shall not apply;

2. The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance; and

3. Solely as respects this endorsement, we will only provide coverage for a claim made against the insured during our policy period.

If the insurance provided by the policy listed in the Schedule of Underlying Insurance provides coverage for Occurrences occurring on or after a specified Retroactive Date or for claims made during an Extended Reporting Period, the insurance provided by our policy will also provide such coverage.

For the purposes of this endorsement, the following definitions apply:

1. **Employee Benefit Programs** shall mean Group Life Insurance, Group Accident or Health Insurance, Pension Plans, Profit Sharing Plans, Employee Stock Subscription Plans, Worker's Compensation, Unemployment Insurance, Social Security and Disability Benefits.

2. **Administration** shall mean:

    a. Giving counsel to employees with respect to Employee Benefit Programs;

    b. Interpreting Employee Benefit Programs;

    c. Handling of records in connection with Employee Benefit Programs; or

    d. Effecting enrollment, termination or cancellation of employees under Employee Benefit Programs;

    provided all such acts are authorized by you.

All other terms and conditions of this policy remain unchanged.

AUTHORIZED REPRESENTATIVE

52081 (2/95)
AH0265

INSURED'S COPY

## ENDORSEMENT No. 9

This endorsement, effective 12:01 AM: July 30, 2001

Forms a part of policy no.: BE   7408845

Issued to: CONTINENTAL CARBON COMPANY (INC)

By: NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

Commercial Umbrella Policy

### CrisisResponse™ and Excess Casualty CrisisFund™

(Advancement of CrisisResponse Costs during a Crisis Management Event and Crisis Communications Management Insurance)

### Additional Declarations

| | | |
|---|---|---|
| Item 1. | CrisisResponse Sublimit of Insurance: $250,000 | Each Crisis Management Event And Aggregate |
| Item 2. | Crisis Management Limit of Insurance: $50,000 | Each Crisis Management Event And Aggregate |
| Item 3. | Premium: | INCLUDED |

This policy is amended to provide for Advancement of CrisisResponse Costs during a Crisis Management Event and Crisis Communications Management Insurance pursuant to the terms, definitions, conditions and exclusions set forth below:

**I.   INSURING AGREEMENTS-CrisisResponse and Excess Casualty CrisisFund**

The following Insuring agreements section is added to this policy for the purpose of the coverage provided by this endorsement:

A. **Advancement of CrisisResponse Costs during a Crisis Management Event**

We will advance on behalf of the Named Insured CrisisResponse Costs that may be associated with damages covered by this policy arising from a Crisis Management Event first commencing during the Policy Period, up to the amount of the CrisisResponse Sublimit of Insurance.

We will advance CrisisResponse Costs that may be associated with damages covered by this policy directly to third parties.

B. **Crisis Communications Management Insurance**

We will pay on behalf of the Named Insured Crisis Management Loss arising from a Crisis Management Event first commencing during the Policy Period, up to the amount of the Crisis Management Limit of Insurance.

74641 (12/99)
AH0550

1999 American International Group, Inc.

Page 1 of 5

---

## ENDORSEMENT No. 8

This endorsement, effective 12:01 AM: July 30, 2001

Forms a part of policy no.: BE   7408845

Issued to: CONTINENTAL CARBON COMPANY (INC)

By: NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### CROSS SUITS EXCLUSION

This insurance does not apply to Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of any injuries initiated, alleged, or caused to be brought about by a Named Insured covered by this policy against any other Named Insured covered by this policy.

All other terms and conditions of this policy remain unchanged.

AUTHORIZED REPRESENTATIVE

60441 (5-94)
AH0187

C. A Crisis Management Event shall first commence at the time during the Policy Period when a Key Executive first becomes aware of an Occurrence that gives rise to a Crisis Management Event and shall end at the earliest of the time when we determine that a crisis no longer exists or when the CrisisResponse Sublimit of Insurance and/or the Crisis Management Limit of Insurance, whichever applies, has been exhausted.

D. There shall be no Retained Limit applicable to CrisisResponse Costs or Crisis Management Loss. We shall pay such CrisisResponse Costs or Crisis Management Loss from first dollar, subject to the other terms and conditions of this endorsement.

## II. LIMITS OF INSURANCE

The following provisions are added to Section III. Limits of Insurance for the purpose of the coverage provided by this endorsement:

A. The CrisisResponse Sublimit of Insurance is the most we will pay for all CrisisResponse Costs under this policy, regardless of the number of Crisis Management Events first commencing during the Policy Period. This CrisisResponse Sublimit of Insurance shall be part of, not in addition to, the Limits of Insurance shown in Item 2 of the Declarations of this policy.

B. The Crisis Management Limit of Insurance is the most we will pay for all Crisis Management Loss under this policy, regardless of the number of Crisis Management Events first commencing during the Policy Period. This Crisis Management Limit of Insurance shall be in addition to the Limits of Insurance shown in Item 3 of the Declarations of this policy.

C. We will have no obligation to advance CrisisResponse Costs or to pay Crisis Management Loss from the earliest of the time when we determine that a Crisis Management Event has ended or when the CrisisResponse Sublimit of Insurance and/or the Crisis Management Limit of Insurance, whichever applies, has been exhausted.

## III. DEFINITIONS

The following definitions are added to Section IV. Definitions for the purpose of the coverage provided by this endorsement:

A. Crisis Management Event means an Occurrence that in the good faith opinion of a Key Executive of the Named Insured, in the absence of Crisis Management Services, has reasonably been associated with or may be associated with:

1. damages covered by this policy that are in excess of the Retained Limit applicable to such damages; and

2. significant adverse regional or national media coverage.

Crisis Management Event shall include, without limitation, man-made disasters such as explosions, major crashes, multiple deaths, burns, dismemberment, traumatic brain injury, permanent paralysis, or contamination of food, drink or pharmaceuticals.

B. Crisis Management Firm means any public relations firm or crisis management firm approved by us that is listed by the Named Insured to perform Crisis Management Services in connection with a Crisis Management Event. Attached to and forming a part of this endorsement is a Schedule of firms that have been pre-approved by us and may be hired by the Named Insured without further approval by us.

1999 American International Group, Inc.
INSURED'S COPY

C. Crisis Management Limit of Insurance means the Crisis Management Limit of Insurance shown in Item 2 of the Additional Declarations of this endorsement.

D. Crisis Management Loss means the following amounts incurred during a Crisis Management Event:

1. Amounts for the reasonable and necessary fees and expenses incurred by a Crisis Management Firm in the performance of Crisis Management Services for the Named Insured solely arising from a covered Crisis Management Event; and

2. Amounts for reasonable and necessary printing, advertising, mailing of materials, or travel by directors, officers, employees or agents of the Named Insured or a Crisis Management Firm incurred at the direction of a Crisis Management Firm, solely arising from a covered Crisis Management Event.

E. Crisis Management Service means those services performed by a Crisis Management Firm in advising the Named Insured on minimizing potential harm to the Named Insured from a covered Crisis Management Event by maintaining and restoring public confidence in the Named Insured.

F. CrisisResponse Costs means the following reasonable and necessary expenses incurred during a Crisis Management Event directly caused by a Crisis Management Event, provided that such expenses have been pre-approved by us and may be associated with damages that would be covered by this policy:

1. Medical expenses;
2. Funeral expenses;
3. Psychological counseling;
4. Travel expenses;
5. Temporary living expenses;
6. Expenses to secure the scene of a Crisis Management Event; and
7. Any other expenses pre-approved by the Company.

CrisisResponse Costs will not include defense costs or Crisis Management Loss.

G. CrisisResponse Sublimit of Insurance means the CrisisResponse Sublimit of Insurance shown in Item 1 of the Additional Declarations of this endorsement.

H. Key Executive means the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, General Counsel or general partner (if the Named Insured is a partnership) or sole proprietor (if the Named Insured is a sole proprietorship). A Key Executive also means any other person designated as such and scheduled by written endorsement.

## IV. EXCLUSIONS

The following exclusions are added to Section IV. Exclusions for the purpose of the coverage provided by this endorsement:

This insurance shall not apply to any CrisisResponse Costs or Crisis Management Loss in connection with a Crisis Management Event:

1999 American International Group, Inc.
INSURED'S COPY

A. arising out of, based upon or attributable to the acts alleged, or in the same or related acts alleged or contained, in any crisis or claim that has been reported, or in any circumstances where notice has been given, under any policy of which (i) this policy is a renewal or replacement of or which it may succeed in time, or (ii) any underlying policy, which is listed in the Schedule of Underlying Insurance, is a renewal or replacement or which it may succeed in time;

B. arising out of, based upon or attributable to any pending or prior crisis, claim, or Suit as of the inception date of this policy;

C. arising directly or indirectly out of:

1. any actual or alleged failure, malfunction or inadequacy of:

   a. any of the following, whether belonging to any Named Insured or to others:

      (1) computer hardware, including microprocessors;

      (2) computer application software;

      (3) computer operating systems and related software;

      (4) computer networks;

      (5) microprocessors (computer chips) not part of any computer system; or

      (6) any other computerized or electronic equipment or components; or

   b. any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph C1a of this exclusion.

   due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 and beyond.

2. any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by or on behalf of the Insured to determine, rectify or test for any potential or actual problems described in Paragraph C1 of this exclusion.

## V. CONDITIONS

The following conditions are added to Section VI. Conditions for the purpose of the coverage provided by this endorsement:

A. You must report any Crisis Management Event to us within twenty-four (24) hours of the time that a Key Executive first becomes aware of an Occurrence that gives rise to a Crisis Management Event or to be eligible for the advancement of CrisisResponse Costs and the payment of Crisis Management Loss.

Notice of a Crisis Management Event may be given by calling 1-877-AIG-3100. If notice is given by telephone, written notice shall be given as soon as practicable thereafter. Written notice should include:

1. how, when and where the Crisis Management Event is taking or took place;

2. the names and addresses of any injured persons and any witnesses; and

3. the nature and location of any injury or damage arising out of the Crisis Management Event.

Written notice should be mailed or delivered to:

AIG Excess Casualty Claim Department
70 Pine Street
New York, NY 10270

B. There shall be no requirement that you obtain prior written approval from us before incurring any Crisis Management Loss, provided that the Crisis Management Firm selected by you to perform the Crisis Management Services has been approved by us. If you choose to retain a firm that does not appear in the Schedule attached to and forming a part of this endorsement, you must obtain our consent, which shall remain in our sole discretion, prior to retaining the services of such firm.

C. Any payments for Crisis Management Loss or advancement of CrisisResponse Costs that we make under this endorsement:

1. shall not be deemed to be a determination of the Insured's liability with respect to any claim or Suit that results from a Crisis Management Event; and

2. shall not create any duty to defend any Suit or to investigate any claim arising from a Crisis Management Event, nor any coverage obligation under this policy.

D. If the Crisis Communications Management Insurance provided by this endorsement and any other insurance issued to the Named Insured by us or any of our affiliated companies shall apply to the same crisis or claim, the maximum limit of insurance under all insurance available shall not exceed the highest applicable limit of insurance available under any one policy or endorsement. This condition does not apply to any other insurance issued by us or any of our affiliated companies specifically to apply as excess insurance over this endorsement.

E. In the event of a dispute between the Named Insured and us as to whether a Crisis Management Event has occurred, the Named Insured may, at its own cost, retain the services of an approved Crisis Management Firm and/or advance CrisisResponse Costs. Provided, however, if the Named Insured elects to retain an approved Crisis Management Firm or to advance CrisisResponse Costs, we shall have no obligation to reimburse under this endorsement the Named Insured for such costs or expenses. The right to reimbursement shall be enforced pursuant to the rules of the American Arbitration Association in New York, New York or in the state indicated in Item 1 of the Declarations of this policy as the Named Insured's principal place of business.

All other terms, definitions, conditions and inclusions of this policy remain unchanged.

Authorized Representative
or countersignature (in states where applicable)

## Excess Casualty Crisis Fund℠
### (Crisis Communications Management Insurance)

Pre-Approved Crisis Management Firms
as of January 10, 2000

### Abernathy MacGregor Frank

**New York Office**
501 Madison Avenue
New York, NY 10022

Contact: James T. MacGregor
(212) 371-5999
(212) 593-1845 fax
jtm@abmac.com

*Emergency*
(212) 986-0256
(917) 593-1845  cell phone

Contact: Andrew H. Brimmer
(212) 371-5999
(212) 593-1845 fax
ahb@abmac.com

*Emergency*
(212) 727-8699
(917) 860-2656  cell phone

**Los Angeles Office**
611 West Sixth Street
Suite 1880
Los Angeles, CA 90017

Contact: len D. Campbell
(213) 630-6550
(213) 489-3443 fax
idc@abmac.com

*Emergency*
(818) 957-5550
(917) 940-3476  cell phone

### Edelman Public Relations Worldwide

**New York Office**
1500 Broadway
New York, NY 10036

Contact: Jon Goldberg
(212) 768-0550
(212) 704-0129 fax
jon_goldberg@edelman.com

*Emergency*
(212) 768-0550
Operator will page contact

Contact: Mitch Baranowski
(212) 704-4441
(212) 704-0129 fax
mitch_baranowski@edelman.com

*Emergency*
(212) 768-0550
Operator will page contact

*Additional United States/Canada Offices: Dallas; Houston; Los Angeles; Miami; Milwaukee; Montreal; Sacramento; San Francisco; Seattle; Silicon Valley; Toronto; Washington, D.C.*

*International Offices:*
*Latin America: Buenos Aires; Mexico City; Sao Paulo*
*Europe: Barcelona; Brussels; Dublin; Frankfurt; Hamburg; London; Madrid; Milan; Paris*
*Asia Pacific: Beijing; Guangzhou; Hong Kong; Kuala Lumpur; Seoul; Shanghai; Singapore; Sydney; Taipei*

### Hill & Knowlton

**New York Office**
466 Lexington Avenue
New York, NY 10017

Contact: Richard C. Hyde
(212) 885-0372
(212) 885-0570 fax

*Emergency*
Contact switchboard @
(212) 885-0300

Contact: Arthur Foster
(212) 885-0442
(212) 885-0570 fax

*Emergency*
Contact switchboard @
(212) 885-0300

AH0559

INSURED'S COPY

---

### Hill & Knowlton (continued)

Contact: Denise DeShane
(212) 885-0390
(212) 885-0570 fax

*Emergency*
Contact switchboard @
(212) 885-0300

Contact: Alex Goldsmith
(212) 885-0467
(212) 885-0570 fax

*Emergency*
Contact switchboard @
(212) 885-0300

*Additional United States/Canada Offices: Atlanta; Chicago; Detroit; Ft. Lauderdale; Houston; Irvine; Los Angeles; Pittsburgh; Montreal; Ottawa; Sacramento; San Francisco; San Juan; Tampa; Toronto; Washington, D.C.*

*International Offices:*
*Latin America: Buenos Aires; Mexico City; Sao Paulo*
*Europe, Middle East, Africa: Amsterdam; Athens; Barcelona; Brussels; Budapest; Dubai; Frankfurt; Helsinki; Jeddah; London; Madrid; Manama; Milan; Moscow; Paris; Prague; Riga; Stockholm; Tallinn*
*Asia Pacific: Auckland; Beijing; Canberra; Guangzhou; Hong Kong; Kuala Lumpur; Melbourne; Shanghai; Singapore; Sydney; Taipei; Tokyo; Wellington*

### Kekst and Company

**New York Office**
437 Madison Avenue
19th Floor
New York, NY 10022

Contact: Ruth E. Pachman
(212) 521-4819
(212) 521-4900 fax

*Emergency*
Leave voice mail or
contact operator @
(212) 521-4800

### Kroll Associates

**New York Office**
900 Third Avenue
New York, NY 10022

Contact: Mary Jo Phillips
(212) 833-3246
(212) 644-5784 fax

*Emergency*
1-800-GET-KROLL
World Wide Crisis Division
24 hours/7 days

### Lexicon Communications Corp.

**Los Angeles Office**
333 South Grand Avenue
Suite 3560
Los Angeles, CA 90071

Contact: Steven B. Fink
(213) 346-1212
(213) 346-1210 fax
sfink@lexiconcorp.com

*Emergency*
Contact switchboard @
(213) 346-1200

### Robinson Lerer & Montgomery

**New York Office**
75 Rockefeller Plaza
6th Floor
New York, NY 10019

Contact: Michael J. Gross
(212) 484-6100
(212) 484-7411 fax

*Emergency*
Contact switchboard @
(212) 484-6100

AH0559

INSURED'S COPY

ENDORSEMENT No. 10

This endorsement, effective 12:01 AM:  July 30, 2001

Forms a part of policy no.:  BE  7408845

Issued to:  CONTINENTAL CARBON COMPANY (INC)

By:  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

**EMPLOYERS LIABILITY FOLLOW-FORM ENDORSEMENT**

This insurance does not apply to Bodily Injury to any employee of the Insured arising out of and in the course of the employee's employment by the Insured.

However, if insurance for such Bodily Injury is provided by a policy listed in the Schedule of Underlying Insurance:

1.  This exclusion shall not apply; and
2.  The insurance provided by our policy will not be broader than that insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

All other terms and conditions of this policy remain unchanged.

AUTHORIZED REPRESENTATIVE

69429 (1/98)
AH0403

Page 3 of 3

AH0559

---

Sard Verbinnen & Co.

New York Office
630 Third Avenue
New York, NY 10017

Contact: George Sard
(212) 687-8080
(212) 687-8344 fax

Emergency
Contact switchboard @
(212) 687-8080

Sitrick and Company Inc.

Los Angeles Office
2029 Century Park East
Suite 1750
Los Angeles, CA 90067

Contact: Michael S. Sitrick
(310) 788-2850
(310) 788-2855 fax

Emergency
(310) 319-2766
24 hours/7 days

Additional United States Offices: New York and Washington, D.C.

ENDORSEMENT No. 11

This endorsement, effective 12:01 AM: July 30, 2001

Forms a part of policy no.: BE   7408845

Issued to:  CONTINENTAL CARBON COMPANY (INC)

By:  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### FOREIGN LIABILITY FOLLOW-FORM ENDORSEMENT

This insurance does not apply to such Bodily Injury, Property Damage, Personal Injury or Advertising Injury that occurs outside the United States of America, its territories and possessions, Puerto Rico and Canada.

However, if insurance for such Bodily Injury, Property Damage, Personal Injury or Advertising Injury is provided by a policy listed in the Schedule of Underlying Insurance:

1.  This exclusion shall not apply; and

2.  The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

All other terms and conditions of this policy remain unchanged.

AUTHORIZED REPRESENTATIVE

57710 (8/98)
AH0109

INSURED'S COPY

---

ENDORSEMENT No. 12

This endorsement, effective 12:01 AM:  July 30, 2001

Forms a part of policy no.:  BE   7408845

Issued to:  CONTINENTAL CARBON COMPANY (INC)

By:  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### NAMED PERIL AND TIME ELEMENT POLLUTION ENDORSEMENT
### (Defense Expenses Outside S.I.R., Version 2)

Exclusion M. of this policy is hereby deleted in its entirety and replaced by the following:

This insurance does not apply to:

1.  Bodily Injury, Property Damage or Personal Injury arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world;

2.  Any loss, cost or expense arising out of any governmental direction or request that we, the Insured or any other person or organization test for, monitor, cleanup, remove, contain, treat, detoxify, neutralize or assess the effects of pollutants; or

3.  Any loss, cost or expense, including but not limited to costs of investigation or attorneys' fees, incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize pollutants.

As used in this exclusion, pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste material includes materials which are intended to be or have been recycled, reconditioned or reclaimed.

However, this exclusion does not apply to Bodily Injury, Property Damage or Personal Injury arising out of:

1.  Any discharge, dispersal, seepage, migration, release or escape directly or indirectly caused by fire, explosion, lightning, windstorm, vandalism or malicious mischief, riot and civil commotion, flood, earthquake, collision or upset of a motor vehicle, mobile equipment or aircraft, automatic sprinkler leakage;

2.  The Products - Completed Operations Hazard ; or

3.  Any discharge, dispersal, seepage, migration, release or escape of pollutants that meets all of the following conditions:

a.  It was accidental and neither expected nor intended by the Named Insured. This condition would not serve to deny coverage for a specific incident where such discharge, dispersal, seepage, migration, release or escape of pollutants was a result of an attempt by the Insured to mitigate or avoid a situation where substantial third party Bodily Injury, Property Damage or Personal Injury could occur; and

b.  It was demonstrable as having commenced on a specific date during the term of this policy; and

c.  Its commencement became known to the Named Insured within seven (7) calendar days and was further reported to the Risk Management Department within a reasonable time frame; and

d.  Its commencement was reported in writing to us within twenty-one (21) calendar days of becoming known to the Risk Management Department; and

Page 1 of 3

55681 (8/98)
AH0332

INSURED'S COPY



**AIG Technical Services, Inc.**
**Environmental Claims Department**
**80 Pine Street, Sixth Floor**
**New York, NY 10005**
**Direct Dial: 212-770-1455**
**Facsimile: 212-747-8775**

R E C E I V E D
OCT 2 2003
PURCHASING

September 29, 2003

<u>**CERTIFIED MAIL- RETURN RECEIPT REQUESTED**</u>

Mike Ingram
Continental Carbon Company, Inc.
333 Cypress Run, Suite 100
Houston, TX 77094

|  | | |
|---|---|---|
| Re: | **Insured:** | Continental Carbon Company, Inc. |
|  | **Site:** | Phenix City Plant |
|  | **Location:** | Phenix City, AL |
|  | **Suit:** | <u>Action Marine, Inc., et al. v. Continental Carbon Inc., et al.</u> |
|  | **Policy:** | National Union Fire Insurance Company of Pittsburgh, PA |
|  |  | BE 7408845 (Eff. 07/30/01 – 07/30/02) |

<u>**DISCLAIMER OF COVERAGE**</u>

Dear Mr. Ingram:

AIG Technical Services, Inc. ("AIGTS"), on behalf of National Union Fire Insurance Company of Pittsburgh, PA ("National Union") previously acknowledged receipt of the above-referenced claim. Please be advised that I have been assigned responsibility for handling this matter. Accordingly, all future correspondence regarding this claim should be sent to my attention.

Coverage is sought under National Union policy BE 7408845. Following an examination of the facts surrounding this claim and a review of the above-referenced policy, coverage is precluded for this claim. Please accept this letter as an explanation for our denial of coverage under National Union policy BE 7408845.

The information received to date indicates that on September 25, 2001, Continental Carbon Company, Inc. ("Continental Carbon") was served with a summons and complaint by Action Marine, Inc., in which it is alleged that Continental Carbon periodically released Carbon Black, a pure powder form of carbon, from its Phenix City, Alabama Carbon Black manufacturing plant ("the Site"). The plaintiffs, Action Marine Inc., and John Thorpe, residents of the State of

**EXHIBIT C**

**H.     Occurrence** means:

1.     As respects **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to conditions, which results in **Bodily Injury** or **Property Damage** neither expected nor intended from the standpoint of the **Insured**. All such exposure to substantially the same general conditions shall be considered as arising out of one **Occurrence** .

**K.     Property Damage** means:

1.     Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use of that property shall be deemed to occur at the time of the physical injury that caused it; or

2.     Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the **Occurrence** that caused it.

The insuring agreement and definition sections of policy BE 7408845 contain language that may preclude coverage for this claim. First, there must be **bodily injury** or **property damage** as those terms are defined in the policy. Second, the **bodily injury** or **property damage**, if any, must be caused by an **occurrence**, as that term is defined in the policy. Finally, the **bodily injury** or **property damage,** if any, must take place during the policy period. To the extent that the alleged **bodily injury** or **property damage** did not take place during the policy period or was not caused by an **occurrence**, there would be no coverage. Accordingly, National Union reserves the right to deny coverage for this claim based on the insuring agreement and definition sections of policy BE 7408845.

Policy BE 7408845 contains the following Exclusion in Endorsement #12 :

<u>**Named Peril and Time Element Pollution Endorsement**</u>
**(Defense Expenses Outside S.I.R., Version 2)**

Exclusion M. of this policy is hereby deleted in its entirety and replaced by the following:

This insurance does not apply to:

1.     **Bodily Injury, Property Damage, or Personal Injury** arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world;

2.     Any loss, cost or expense arising out of any governmental direction or request that we, the **Insured**, or any other person or organization test for, monitor, clean-up, remove, contain, treat, detoxify, neutralize or assess the effects of pollutants; or

3.    Any loss, cost or expense, including but not limited to costs of investigation or attorney's fees, incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify, or neutralize pollutants.

As used in this exclusion, pollutants mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material.  Waste material includes materials, which are intended to be or have been recycled, reconditioned or reclaimed.

However, this exclusion does not apply to **Bodily Injury, Property Damage** or **Personal Injury** arising out of:

1.    Any discharge, dispersal, seepage, migration, release or escape directly or indirectly caused by fire, explosion, lightning, windstorm, vandalism or malicious mischief, riot and civil commotion, flood, earthquake, collision, or upset of a motor vehicle, mobile equipment or aircraft, automatic sprinkler leakage;

2.    The **Products-Completed Operations Hazard**; or

3.    Any discharge, dispersal, seepage, migration, release or escape of pollutants that meets all the following conditions:

   a.    It was accidental and neither expected nor intended by the **Named Insured**.  This condition would not serve to deny coverage for a specific incident where such discharge, dispersal, seepage, migration, release or escape of pollutants was a result of an attempt by the **Insured** to mitigate or avoid a situation where substantial third party **Bodily Injury, Property Damage** or **Personal Injury** could occur, and

   b.    It was demonstrable as having commenced on a specific date during the term of this policy; and

   c.    Its commencement became known to the **Named Insured** within twenty (20) calendar days and was further reported to the Risk Management Department within a reasonable time frame; and

   d.    Its commencement was reported in writing to us within eighty (80) calendar days of becoming known to the Risk Management Department; and

   e.    Reasonable effort was expended by the **Named Insured** to terminate the situation as soon as conditions permitted.

Continental Carbon
09/29/03
Page 5 of 7

However, nothing contained in this provision 3. shall operate to provide any coverage with respect to:

a.  Any site or location principally used by the **Insured**, or by others on the **Insured's** behalf, for the handling, storage, disposal, dumping, processing or treatment of waste material;

b.  Any fines or penalties;

c.  Any clean up costs ordered by the Superfund program, or any federal, state, or local governmental authority. However, this specific exclusion c. shall not serve to deny coverage for third party clean up costs otherwise covered by this endorsement simply because of the involvement of a governmental authority;

d.  Acid rain;

e.  Clean up, removal, containment, treatment, detoxification or neutralization of pollutants situated on premises the **Insured** owns, rents or occupies at the time of the actual discharge, dispersal, seepage, migration, release or escape of said pollutants.

It is further agreed that solely as respects any coverage granted by this endorsement:

1.  The Self-Insured Retention in item 3.D. of the Declarations is amended to $1,000,000;

2.  The Self Insured retention shall not include "Defense Expenses."

"Defense Expenses" means a payment allocated to a specific loss, claim or suit for its investigation, settlement or defense, including but not limited to:

a.  attorney's fees and all other investigation, loss adjustment and litigation expenses;

b.  premiums on bonds to release attachments;

c.  premiums on appeal bonds required by law to appeal any claim or **suit**;

d.  costs taxed against the **Insured** in any claim or **suit**;

e.  pre-judgment interest awarded against the **Insured**;

f.  interests that accrues after entry of judgment.

3.    In Section II, Defense, provision A.2. is hereby deleted in its entirety; and

4.    We will not be obligated to assume charge of the investigation, settlement or defense of any claim made, **suit** brought or proceeding instituted against the **Insured**. We will, however, have the right and shall be given the opportunity to participate in the defense and trial of any claims, **suits** or other proceedings relative to any **Occurrence** which, in our opinion, may create liability on our part under the terms of this policy. If we exercise such right, we shall do so at our own expense.

It is further agreed that in the event of a disagreement as to the interpretation of this endorsement, the disagreement shall be submitted to binding arbitration before a panel of three (3) arbitrators. Within thirty (30) days of a written request for arbitration by either you or us, each party will choose an arbitrator. If the two arbitrators are unable to agree within one month upon the third arbitrator, such arbitrator shall at the request of either party be selected by the American Arbitration Association in accordance with its rules and procedures.

The parties shall submit their cases to the panel by written and oral evidence at a hearing time and place selected by the third arbitrator. The panel shall be relieved of all judicial formality, shall not be obligated to adhere to the strict rules of law or evidence, shall seek to enforce the intent of the parties hereto and may refer to, but are not limited to, relevant legal principles. The decision of at least two (2) of the three (3) panel members shall be binding and final and not subject to appeal except for grounds of fraud and gross misconduct by the arbitrators. The award shall be issued within thirty (30) days of the close of the hearings. Each party shall bear the expenses of its designated arbitrator and shall jointly and equally share with the other the expense of the third arbitrator and of the arbitration.

The arbitration proceedings shall take place in the vicinity of New York, NY. The procedural rules applicable to the arbitration shall, except as provided otherwise herein, be in accordance with the Commercial Arbitration Rules of the v American Arbitration Association.

Coverage for this claim is precluded under Paragraph 1. of the above-referenced pollution exclusion endorsement. Paragraph 1. precludes coverage for bodily injury or property damage arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world. The Plaintiffs seek damages for bodily injury and property damage as a result of the alleged release of Carbon Black, a carcinogen, from Continental Carbon's manufacturing plant.

The above-referenced exclusion applies unless the conditions of the time element exception of the Named Peril Pollution Endorsement are met. However, the exceptions to the exclusion are inapplicable because the facts of this claim does not comply with the exception. Specifically, this claim did not arise out of a discharge caused by a named peril, the Products-Completed Operations Hazard or the conditions of section 3. Section 3. (a) of the exception is not met

because the alleged discharge, dispersal, seepage, migration, release or escape of pollutants was not accidental, unexpected or unintended by the insured, but an intentional act arising out of the Insured's regular, continuous business operations as alleged by the Plaintiffs. Further, the alleged discharge, dispersal, seepage, migration, release or escape of pollutants was not demonstrable as having commenced on a specific date during the term of this policy as required in section 3. (b) of the time element exception. Instead, is alleged that the discharge, dispersal, seepage, migration, release or escape of pollutants was completed over a period of time as a part of the Insured's regular, continuous manufacturing process. National Union relies on the above-referenced pollution exclusion endorsement to deny coverage for this claim under policy BE 7408845.

Based on the foregoing, National Union hereby denies coverage under policy BE 7408845 for the claim presented. Should you have or obtain any information which you believe would alter our coverage position, please forward it to the undersigned. The review of such information will be conducted without waiver of this denial of coverage and under a full reservation of rights.

National Union submits this letter reserving all of National Union's rights and defenses in every respect under the terms, conditions, and provisions of the above-referenced policy and any other policies you may identify, as well as the rights and defenses that may be available in law or equity. Any action taken by National Union shall not constitute an admission of liability or an admission of coverage and should not be deemed a waiver of any right to disclaim liability or coverage. Additionally, National Union reserves the right to assert any defense based upon any policy provision as additional policy and/or factual information is obtained.

Should you have any questions regarding the foregoing, please do not hesitate to contact me at 212-770-1455, or my manager, Debra Nelson, at 212-770-1015.

Very truly yours,

Vanessa Wallace
Home Office Supervisor
Environmental Claims

Cc:

Wellington R. Stevens, Jr.
Lockton Insurance Agency of Dallas, Inc.
717 N. Harwood, Lock Box 27
Dallas, TX 75201

DUPLICATE

Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602000568
Cashier ID: brobinso
Transaction Date: 09/28/2007
Payer Name: BRADY RADCLIFF BROWN
------------------------------------
CIVIL FILING FEE
 For: BRADY RADCLIFF BROWN
 Case/Party: D-ALM-3-07-CV-000872-001
 Amount:        $350.00
------------------------------------
CHECK
 Check/Money Order Num: 002683
 Amt Tendered:  $350.00
------------------------------------
Total Due:        $350.00
Total Tendered:   $350.00
Change Amt:       $0.00

CONTINENTAL CARBON V. NATIONAL
UNION FIRE INS CO